**CASE NO. 24-3388**

# UNITED STATES COURT OF APPEALS
## FOR THE
# SIXTH CIRCUIT

**John Noakes**

*Plaintiff-Appellant*

v.

**University of Cincinnati, et al**

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Civil Action No. 1:23-cv-00284-MRB
Honorable Michael R. Barrett, United States District Judge, presiding

**BRIEF OF APPELLANT JOHN NOAKES**

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation. There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE ...................................................................ii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...............................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF ISSUES .......................................................................3

STATEMENT OF THE CASE ..................................................................4

    A.   Background: The Dear Colleague Letter And Regulations .............................4

    B.   UC Adopts Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education. ................6

    C.   The Disciplinary Proceedings Against Noakes ...................................8

    D.   Procedural Background.......................................................................14

SUMMARY OF ARGUMENT..................................................................16

ARGUMENT ...........................................................................................19

    A.   Standards Of Review.........................................................................19

    B.   The Eleventh Amendment Does Not Bar The Prospective Relief Sought By Noakes ............................................................................20

    C.   Noakes Has A Substantial Likelihood Of Success On The Merits .............22

        1.   College And University Students Have A Constitutionally Protected Interest In Continued Enrollment ...........................................22

        2.   UC Failed To Provide Noakes With The Constitutionally Required Fundamentally Fair Disciplinary Process................................23

            a.   Standard ...................................................................................24

            b.   UC Failed To Provide Noakes With Sufficient Notice.................25

                i.   The Initial Notice Was Too Vague To Permit Noakes A Meaningful Opportunity To Prepare For An Investigation .......................................................................26

                ii.   Noakes Faced A Moving Target ...............................................30

            c.   The Hearing Panel Relied Upon Undisclosed And Unreliable Expert Evidence ..............................................................34

i.      The Use Of The BAC Calculator Violated This
        Court's Requirement That Evidence Be Disclosed ..............34

ii.     The Use Of The BAC Calculator Violated This
        Court's Requirement That Evidence Relied Upon
        At An Administrative Hearing Must Be Reliable ..................38

d.      The Entire Process, Including Investigation And
        Hearing, Was Fundamentally Unfair ................................39

i.      The Delays In This Case Prejudiced Noakes .........................40

ii.     Noakes Was Denied Access To Crucial Evidence
        That Would Have Permitted Effective Cross-
        Examination ...............................................................42

iii.    The Perplexing Decision Permits An Inference Of
        Bias..........................................................................44

iv.     The Multiple Procedural Errors Permit An
        Inference Of Bias And Created A Fundamentally
        Unfair Process............................................................46

v.      The Consultants Used On The Hearing And
        Appeals Panels Were Biased ........................................48

D.      Noakes Will Suffer Irreparable Harm In The Absence Of
        Injunctive Relief .......................................................................51

E.      The Balance Of The Equities, Public Interest, And Minimal Harm
        To Third Parties Support The Issuance Of An Injunction...........52

F.      Nominal Bond Should Be Required ................................................53

CONCLUSION .........................................................................................53

CERTIFICATE OF COMPLIANCE..........................................................54

CERTIFICATE OF SERVICE....................................................................54

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS...............55

## TABLE OF AUTHORITIES

### Cases

*Ashford v. Univ. of Michigan*, 89 F.4th 960 (6th Cir. 2024) ....................................21

*Block v. Canepa*, 74 F.4th 400 (6th Cir. 2023) ........................................................21

*Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78,(1978).....................22

*Brown v. Strickler*, 422 F.2d 1000 (6th Cir. 1970)....................................................22

*Carey v. Piphus*, 435 U.S. 247, 266-267 (1978) ......................................................37

*City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427 (6th Cir. 2014) ...............................................................................................20

*Dietchweiler v. Lucas*, 827 F.3d 622 (7th Cir. 2016) ................................................32

*Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961)...............................22, 25

*Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) ...................................53

*Doe v. Alger*, 228 F. Supp. 3d 713 (W.D.Va.2016)....................................................35

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ..................................................*passim*

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D.Mass. 2016)..........................................29

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016)................................................9

*Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016) ...............................................21, 34

*Doe v. Kenyon College*, S.D. Ohio No. 2:20-cv-4972...............................................51

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ..........................................*passim*

*Doe v. Michigan State Univ.*, 989 F.3d 418 (6th Cir. 2021) ...........................................19

*Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020) ...........................................44, 46

*Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016) ........................................43

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881 (S.D.Ohio 2018) ........................................4

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019)..........................................21, 44

*Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602 (E.D.Va. 2016) ...............................................................................................47

*Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:19-cv-1467, 2020 U.S. Dist. LEXIS 85708 (May 15, 2020).............................................................................................43

*Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th Cir. 2020) ...................................46

*Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d 704 (S.D.Ohio 2016) ...........................53

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) ...............................*passim*

*Doe v. Univ. of Ky.*, 860 F.3d 365 (6th Cir. 2017) ..............................................23

*Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017) ..............................................................29

*Doe v. Virginia Polytechnic Inst.*, W.D.Va. No. 7:21-cv-378, 2024 U.S. Dist. LEXIS 60513 (Apr. 2, 2024) ..............................................................33

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019) ...........................*passim*

*Erny* v. *Board of Trustees of Indiana Univ.*, S.D. Ind. No. 1:22-cv-00524 (June 3, 2024) ..............................................................45

*Ex Parte Young*, 209 U.S. 123 (1908) ..............................................................21

*Faparusi v. Case W. Res. Univ.*, 711 F.App'x 269 (6th Cir. 2017)...........................29

*Flaim v. Med. Coll. of Ohio,* 418 F.3d 629 (6th Cir. 2005) ...............................*passim*

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007)...........................................21

*Furey v. Temple Univ.,* 884 F.Supp.2d 223 (E.D.Pa. 2012) .............................47

*Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, S.D. Ohio No. 1:11-cv-850 ..............................................................50

*Goldberg v. Kelly*, 397 U.S. 254 (1970).....................................................23

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000)...................20

*Goss v. Lopez*, 419 U.S. 565 (1975) .......................................................*passim*

*Hammond v. Baldwin*, 866 F.2d 172 (6th Cir. 1989).....................................49

*Heyne v. Metro. Nashville Pub. Schs*, 655 F.3d 556 (6th Cir. 2011) ...................23

*In re Murchison*, 349 U.S. 133 (1955) ....................................................48

*Jaksa v. Regents of Univ. of Michigan*, 787 F.2d 590 (6th Cir. 1986)...................23

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...............................................24

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ...............................................24

*Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987)...................................49

*Navarro v. Fla. Inst. of Tech., Inc.*, M.D. Fl. No. 6:22-cv-1950 ...........................50

*Nokes v. Miami Univ.,* S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017) ............................................................... 33, 37

*Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524 (6th Cir. 2014) ..........................20

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't,* 305 F.3d 566 (6th Cir. 2002) .....................52

*Plummer v. Univ. of Houston,* 860 F.3d 767 (5th Cir. 2017) ...................................38

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir. 1996) ...........................19

*Roadway Express v. Reich,* 6th Cir. No. 93-3787, 1994 U.S. App. LEXIS 22924 (Aug. 22, 1994) ...........................................................49

*Rose v. Kenyon College,* S.D. Ohio No. C2-00-1299 & C2-00-1378....................................50

*Shepard v. Irving,* 77 F. App'x 615 (4th Cir. 2003) ........................................21

*Sunless, Inc. v. Palm Beach Tan, Inc.,* 33 F.4th 866 (6th Cir. 2022) .....................................20

*Tumblebus Inc. v. Cranmer,* 399 F.3d 754 (6th Cir. 2005)..................................20

*Utica Packing Co. v. Block,* 781 F.2d 71 (6th Cir.1986).....................................49

*VanNahmen v. Dodge City Community College,* D.Kan. No. 17-CV-1174-EFM, 2018 U.S. Dist. LEXIS 132451 (Aug. 7, 2018)....................................29

*Williams v. Pennsylvania,* 571 U.S. 1 (2016) ...............................................48

*Withrow v. Larkin,* 421 U.S. 35 (1975) ...................................................48

*Woods v. Willis,* 515 F.App'x 471 (6th Cir. 2013)........................................ 17, 38

*York Risk Servs. Group v. Couture,* 787 F.App'x 301 (6th Cir. 2019) ................................20

*Zinermon v. Burch,* 494 U.S. 113 (1990) .................................................37

**Statutes**

20 U.S.C. § 1681 ......................................................................2

28 U.S.C. § 1292 ......................................................................2

34 C.F.R. 106.45 ................................................................. 44, 51

42 U.S.C. § 1983 .....................................................................2

O.A.C 3361:40-5-05 ...................................................................6

O.R.C. 3345.21.........................................................................6

O.R.C. 5924.120........................................................................26

**Other Authorities**

Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil
    Rights, U.S. Dep't of Educ. (Apr. 4, 2011)............................................................4

Meg Bolte et al, *A Troubling Trend: As on-campus rape reports rise, UC
    continues to issue few alerts,* News Record, April 15, 2021 .................................5

Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The
    Snake Is Eating Its Own Tail,* 53 Idaho L. Rev. 639 (2017) ................................4

Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in
    Judicial Involvement in Campus Sexual Misconduct Adjudications,* 22 N.Y.U. J.
    Legis. & Pub. Pol'y 49 (2019) ..............................................................................16

*How a Yale Student's Rape Accusation Exposed Her to a Defamation Lawsuit,*
    NY Times, Sept. 17, 2023 .....................................................................................50

Laurence H. Tribe, *American Constitutional Law,* § 10-13, at 714 (2d ed.
    1988) .......................................................................................................................38

Open Letter From Members Of The Penn Law School Faculty:  Sexual
    Assault Complaints: Protecting Complainants And The Accused
    Students At Universities, Feb. 8, 2015 ...................................................................4

*Rethink Harvard's Sexual Harassment Policy,* Boston Globe (Oct. 15, 2014) .......................4

OCR Docket #15-16-2039 .........................................................................................6

OCR Docket #15-16-2178 .........................................................................................6

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellant respectfully suggests that the Court would benefit from hearing oral argument in this matter. This case raises an issue of significant concern: the procedures used by educational institutions to discipline students for allegations of sexual misconduct. Since the publication of the April 2011 "Dear Colleague" Letter" by the Department of Education, which provided guidance on how universities may comply with Title IX's requirements pertaining to sexual harassment and violence, this Court has, in more than one occasion, found that the procedures adopted by some colleges and universities violated the Due Process guarantees of the Fourteenth Amendment. Appellant believes oral argument will assist the Court in its analysis of the disputed issues presented on appeal and will enable counsel to address any questions the Court may have.

## JURISDICTIONAL STATEMENT

This case arose, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the due process guarantees of the United States Constitution, and 42 U.S.C. § 1983.  Accordingly, the District Court had jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. (Complaint, R.1.)

This is an appeal from a decision of a district court of the United States denying a motion for a preliminary injunction.  (Motion, R.3; Order, R.48.)  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). A timely Notice of Appeal was filed on May 3, 2024.  (Notice of Appeal, R.49.)

**STATEMENT OF ISSUES**

Whether the District Court committed reversible error in failing to grant a Motion for a Preliminary Injunction by concluding that Appellant did not have a substantial likelihood of success on his procedural due process claims contrary to this Court's opinions in *Flaim*, *Univ. of Cincinnati*, *Univ. of Miami*, *Baum*, and *Endres*?

**STATEMENT OF THE CASE**

**A.    Background: The Dear Colleague Letter And Regulations**

In 2011, after years of criticism for being too lax on campus sexual assault, the U.S. Education Department's Office of Civil Rights ("OCR") sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints.[1]  The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department of Education would pursue violations of Title IX that could lead to the revocation of all federal funding.  Judge Graham observed that the procedures adopted by schools in response to the DCL were often lacking in basic due process protections:

> Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

In 2017, the Department of Education withdrew the Dear Colleague Letter.[2]

Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017).  OCR

---

[1] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011).

[2] OCR quoted law faculty from Penn and Harvard.  *See Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014).

observed that prior actions "may have been well-intentioned, but… led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." In 2020, the Department of Education released a Final Rule that, *inter alia*, prescribed a new grievance process with increased due process protections for students. The Biden Administration has promulgated new rules that go into effect on August 1, 2024 which returns many practices to Obama Administration standards.

In the years preceding the disciplinary actions against Noakes there was substantial criticism of UC, both in the student body and in the public media, accusing UC of not taking seriously complaints of female students alleging sexual assault by male students. (Complaint, R.1, PageID#11-12.) This has included adverse news coverage, campus meetings or protests, and enforcement actions concerning UC. The student newspaper quoted a student who had been sexually assaulted stating, "At the end of the day, UC does not give a f--k because they feel like they don't have to."[3] In 2020, one of the founders of a group of students critical of UC's response to sexual assault submitted an affidavit to the District Court in a separate case stating that Defendant Marshall, who oversees the Title IX Office and UC's response to the problem of sexual assault on campus, "was good at seeming like she cared, but she did not take Title IX

---

[3]Meg Bolte et al, *A Troubling Trend: As on-campus rape reports rise, UC continues to issue few alerts,* News Record, April 15, 2021.

issues seriously…"[4]   UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.[5]   (Complaint, R.1, PageID#13-14.)

## B.   UC Adopts Policies And Procedures In Response To Pressure From Students, The Public, And The Department Of Education.

Against this background, UC adopted two policies at issue here:  The Code of Student Conduct and a separate "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties," also known as the "Title IX Policy." The Code of Student Conduct was codified at O.A.C 3361:40-5-05 pursuant to R.C. 3345.21.  The Title IX Policy was not codified. The Title IX Policy contains fewer procedural protections for students accused of sexual misconduct than the Code of Conduct.  (Policy, R.1-2, PageID#68; Policy, R.1-3, PageID#103.)

The Title IX policy prohibits "Sexual Assault" which includes "Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant is incapable of giving consent because of incapacitation."[6]   (Policy, R.1-3, PageID#106.)  The Title IX Policy provides that no

---

[4] Case: 1:19-cv-00398, Doc#69-3.

[5] OCR Docket #15-16-2039; OCR Docket #15-16-2178.

[6] The Title IX Policy defines "Incapacitated or incapacitation" as "A state in which rational decision-making or the ability to consent is rendered impossible because of a person's temporary or permanent physical or mental impairment…"  The Title IX Policy further explains, "Incapacitation is determined based on the totality of the circumstances. Incapacitation is more than intoxication, but intoxication can cause incapacitation."

individual involved in the process – including all decision-makers, "may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.  All training materials for staff and decision-makers must "be made publicly available on the University's website." (Policy, R.1-3, PageID#128.)

Reports of sexual misconduct may be made by any "means that results in the Title IX Coordinator receiving the verbal or written report." (Policy, R.1-3, PageID#109.)  However, "In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator."

The Title IX Policy notes that "prompt reporting is important to facilitate a thorough investigation" and that "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process."  (Policy, R.1-3, PageID#113.)  The Title IX Policy contains certain time requirements for the "reasonably prompt" resolution of allegations.  The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days."   The Title IX Policy allows for delays and "the limited extension of timeframes" only for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.  (Policy, R.1-3, PageID#114-115.)

During an investigation, the investigator is required to interview "individuals involved, witnesses, and any other persons determined to have relevant knowledge of

the circumstances…" The investigator is supposed to "review" any "related physical evidence and/or materials…," however, UC may not access medical or psychiatric records without the consent of a party. UC does not permit witnesses to review statements prior to the inclusion in the investigative report, and the investigator does not record statements or maintain contemporaneous notes of interviews. (Shaw Depo., R.31, PageID#1182-1183.) The Title IX Policy provides that UC will provide all parties with a copy of the investigative report prior to any hearing "for their review and written response." A live hearing is then conducted to determine responsibility. Appeals on certain limited grounds are permitted. (Policy, R.1-3, PageID#119-124.) Students found to have engaged in prohibited conduct in violation of the Title IX Policy are subject to a range of sanctions ranging from educational discussions to probation, suspension, or dismissal from the University.

## C.    The Disciplinary Proceedings Against Noakes

On Friday, September 10, 2021, John Noakes[7] and a female UC student, Jane Roe, engaged in sexual activity after meeting at a fraternity party. Roe, over the next few days, came to believe that she had been drugged and raped.[8] She went to the

---

[7] The Trial Court granted Plaintiff's Motion for Leave to Proceed Anonymously. (R.2; May 23, 2023 Entry.)

[8] Noakes unequivocally denies Roe's allegations and that he violated the UC Code of Student Conduct or the Title IX Policy. The underlying "guilt" or innocence of Noakes is not relevant. *See Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 312-313 (D.R.I. 2016) ("It is not the Court's role to determine the facts of what happened between" the students).

hospital for an examination and contacted a detective from the Cincinnati Police Department. The police declined to pursue criminal charges. (Complaint, R.1, PageID#21-22.)

On March 30, 2022, the Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity & Sorority Life. (Report, R.30-5, PageID#1108.) The report indicated that Roe had "recounted an incident that happened in September at a party hosted by Sigma Alpha Epsilon fraternity at their chapter house." Roe alleged that she had been drugged and sexually assaulted by Noakes. On April 6, 2022, Roe met with OGEI Investigator Morgan Shaw. (Shaw Depo., R.30, PageID#988.)

Two-and-a-half months later, on July 26, 2022, Roe submitted a signed Formal Complaint. (Form, R.30-5, PageID#1114-1115.) Three weeks after that, on August 18, 2022, UC informed Noakes of the complaint. The notice stated:

> on September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. (Sigma Alpha Epsilon house) [Noakes] engaged in vaginal intercourse with [Roe] without [Roe's] consent.

(Notice, R.30-3, PageID#1064.) Noakes responded to the investigator, stating, "I intend to fully cooperate with any investigation." Noakes requested more details of the nature of the allegations being made, a copy of the complaint filed by Roe, and "the date of the initial contact between [Roe] and the Title IX Office" before agreeing to be interviewed. (Emails, R.29-14, PageID#977-979.) Shaw did not provide additional information.

On August 30, 2022, Noakes again requested more information about the allegations and the date of the report.[9]  Shaw again did not provide any additional details of Roe's accusations.  Worse: she provided misleading information about the date of Roe's report.[10]

On August 31, 2011, Noakes yet again requested "more details, including a copy of any statements or complaints submitted."  He also specifically requested when Roe "first submitted an incident report or otherwise informed the OGEI about the alleged misconduct."  Noakes responded, "We would like to meet with you, but before doing so would like the opportunity to review the statement provided by the complainant."  Shaw denied this request.  (Emails, R.32-3, PageID#1501-1504.)

On September 20, 2022, Shaw met with Noakes. Noakes told Shaw that he believed that the sexual activity with Roe was consensual but declined to provide a more detailed statement until after he was told the exact nature of the allegations against him. Shaw declined to provide to Noakes any further information about the nature of the

---

[9] Noakes specifically requested three pieces of information:  (i) a more detailed statement of the conduct that allegedly violates any UC policy; (ii) the date when the complainant first contacted the Title IX Office; and (iii) any accommodations or benefits provided to Roe as a result of her claim to be a victim of sexual misconduct. He added, "This information is vital to my gathering evidence in my defense."  (Email, R.32-3, PageID#1502.)

[10]  Shaw told Noakes that Roe "submitted a Formal Complaint on July 26, 2022" – a statement that is technically true but misleading by omitting when Roe first contacted the Title IX Office.  (Email, R.29-14, PageID#977; Pl. Depo., R.32, PageID#1407.).

allegations and then mis-represented their conversation in her report. (Email, R.31-17, PageID#1388.)

Shaw met with Roe twice. Roe never told Shaw that she was too intoxicated to consent to sexual activity with Noakes. Roe also indicated that her memory was hazy: "I think the last thing I remember was going back in the house. After that I don't remember anything." She claimed to have "flashes" of memory. Roe told Shaw that she went to the hospital to have an examination but did not provide, and Shaw did not request, any medical records. (Report, R.30-5, PageID#1078-1086.)

Over the next few months, Shaw emailed Noakes a number of times, stating that she was "continuing to investigate…" Shaw never provided any information on exactly what investigative steps she was taking. During this time, Shaw spoke with nine friends of either Noakes or Roe; none had any first-hand knowledge of their interaction. (Report, R.30-5, PageOD#1074-1075.)

On November 10, 2022 – approximately 153 business days from the first report to OGEI and approximately 76 business days from Roe's 'formal' complaint – Shaw provided Noakes with a draft report to review. Noakes sent an email requesting that the Report correct a mischaracterization of his refusal to provide a statement and include information that might affect the credibility of Roe, such as any supportive measures or other benefits that Roe received as a result of her claim that she was a victim of sexual misconduct. Noakes also requested that the report remove any references to Roe possibly being drugged since there was no evidence to support such

a claim and that the Report indicate that if Roe declined to produce her medical records, the finder of fact should infer that the evidence would be unfavorable and unsupportive of her story.  (Emails, R.30-6, PageID#1156-1157.)  Shaw made no changes to the investigation.

UC held a hearing.  The hearing panel consisted not of school officials, but of individuals who work for a for-profit consulting firm, TNG Consulting.  Noakes objected that TNG Consulting and its affiliates were biased because the firm routinely provides expert opinions and testimony on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct.  UC denied the objections.[11]  (Emails, R.30-7, PageID#1159-1160.)

At the hearing, Shaw falsely stated that Noakes "indicated that they were not interested in providing any additional information or a statement…"  and one of the panelists improperly questioned Noakes about his refusal to provide a statement.  (Hearing, R.37, at approx. 0:33:00, 2:11:29.)  Roe was permitted to testify that she had a rape exam done shortly after the alleged incident; she provided selected pictures and a summary of some test results, but no actual medical records or test results from this examination.  (Hearing, R.37, at approx. 1:05:53, 1:08:13.)  Noakes' Advisor was cut off from asking Roe relevant questions.  (Hearing, R.37, at approx.. 1:15:20.)

---

[11] UC allowed an objection to the participation of the founder of the firm.  Noakes informed UC that this individual was involved in litigation that called his integrity into question.  UC substituted another individual from TNG.

On March 23, 2023, Noakes was informed that he had been found responsible for violating the UC Title IX Policy.  (Letter, R.1-4, PageID#130.)  The hearing panel rejected the claim that Roe had been drugged.  The hearing panel concluded – even though this was specifically denied by Roe – that Roe was unable to consent to sexual activity (i.e. "incapacitated") due to alcohol use.  The panel wrote:

> Throughout the grievance process, Complainant suggested that she might have been drugged on the night/morning of the incident, but the Panel concluded there is insufficient evidence to suggest drugging and the preponderance of the evidence supports a conclusion that any potential incapacitation was caused by alcohol intoxication.

(Letter, R.1-4, PageID#136.)

The hearing panel found that Roe was too intoxicated to consent to sexual activity because she had consumed "roughly six to seven standard drinks" over the course of the evening.[12]  The hearing panel, on its own initiative, used this evidence to calculate Roe's blood alcohol level based on an online calculator provided by the American Addiction Centers.  The hearing panel estimated that Roe's blood alcohol level was between "0.19% to 0.23%." The hearing panel noted that, according to this website, a person with this level of intoxication could suffer "Loss of consciousness and memory impairment…"  (Letter, R.29-2, PageID#594-595.)

---

[12] But: Roe told the hearing panel that this was a "rough estimate" and that she spilled a lot of her drinks on the dance floor.  She also said that "the glasses that we were drinking out of weren't… like a standard glass of wine…" (Hearing, R.37, at approx. 1:42:35.)

Noakes appealed.  UC appointed an appeals panel that, like the hearing panel, consisted of consultants.  Noakes objected that the consultants on the appeals panel were affiliated with a law firm that provides training to UC staff and represents colleges and universities in litigation brought by students challenging disciplinary proceedings; this was summarily denied.  (Emails, R.30-8, PageID#1163-1164.)  This objection was denied. The appeals panel acknowledged some procedural or "compliance" flaws in the process but still declined to order a new hearing, ultimately finding that "there is insufficient evidence to demonstrate that the procedural error affected the outcome of the matter."  (Decision, R.35, PageID#1728.)

Noakes was expelled from UC.

This litigation followed.

**D.    Procedural Background**

Noakes filed a Motion for a Preliminary Injunction seeking to preliminarily enjoin UC officials from imposing disciplinary sanctions against him, requiring that the school officials remove any negative notations from his disciplinary records, and prohibiting officials from reporting or disclosing that he was expelled for disciplinary reasons.   (Motion, R.3.)  The trial court permitted the parties to conduct limited expedited discovery, including depositions, relevant to the Motion for Preliminary Injunction.  The parties submitted the matter to the trial court for resolution on a record consisting of affidavits from the parties, depositions, and the discovery obtained.  The trial court heard oral argument in February 2024 and subsequently issued an Order

denying the Motion for Preliminary Injunction. (Order, R.48.)  This appeal followed.

(Notice of Appeal, R.49.)

## SUMMARY OF ARGUMENT

This is one of many cases in this and other courts that address the various policies and procedures schools like UC have adopted to respond to allegations of sexual assault on campus.[13] This Court has had the opportunity to address the constitutional rights of students facing disciplinary actions on a number of occasions. *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629 (6th Cir. 2005); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019). The result: "[T]ime and again this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct" and that, as a result, due process protections must be robust. *Baum*, 903 F.3d at 582.

In *Flaim*, this Court said that students must receive sufficient notice of the charges against them and a meaningful opportunity to prepare for a hearing. 418 F.3d at 638. UC acted contrary to this precedent because (i) Noakes was never informed in advance of the hearing that he could be found responsible for engaging in sexual activity with Roe when she was intoxicated; and (ii) at the hearing, Noakes faced a 'moving target' that shifted from a claim that Roe had been drugged to a claim that Roe was intoxicated.

---

[13] *See e.g.* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49 (2019).

In *Miami Univ* and *Endres*, this Court held that a student's due process rights are violated when a decision maker relies on information from an outside source without disclosing this information to the student prior to the hearing.    882 F.3d at 603;  938 F.3d at 301-302.   And in *Woods v. Willis*, 515 F.App'x 471, 483-484 (6th Cir. 2013), this Court held that evidence relied upon in an administrative hearing must be reliable.    UC acted contrary to these precedents when its hearing panel relied on an unreliable online blood alcohol calculator without providing Noakes the opportunity to respond and rebut this scientific evidence.

In *Univ. of Cincinnati* and other cases, this Court held that students are entitled to fundamental fairness in the disciplinary process.   UC acted contrary to this precedent when it: failed to act diligently in investigating the allegations of sexual misconduct by Noakes; denied Noakes the ability to cross-examine Roe on issues affecting her credibility; contrived a theory that Roe was too intoxicated to engage in sexual activity despite her statements to the contrary; and used biased decision makers.

The remaining preliminary injunction factors favor the granting of relief for the reasons this Court articulated in *Univ. of Cincinnati*.   School discipline constitutes irreparable harm because of the risk of damage to a student's academic and professional reputations and the adverse effect on a student's ability to enroll at other institutions of higher education and to pursue a career.   An injunction will not cause any harm to third parties or UC, as UC remains able to enforce its rules and regulations in a manner consistent with the Court's precedents.   Finally, an injunction is in the public interest

because, as this Court held in *Univ of Cincinnati,* "while the public has a competing interest in the enforcement of Title IX, that interest can never override individual constitutional rights." 872 F.3d at 407.

**ARGUMENT**

"The Due Process Clause guarantees *fundamental fairness* to state university students facing long-term exclusion from the educational process." *Univ. of Cincinnati* 872 F.3d at 396 (emphasis supplied).

That much should be uncontested.

But context is important. Due process is not an abstract idea divorced from the real world and the practicalities of the particular situation. Noakes was accused of a sexual assault and faced expulsion, an accusation and possible sanction that "heightens… the procedural protections to which due process entitles him" and "entitle[s a student] to an extra layer of procedural protection." *Doe v. Michigan State Univ.*, 989 F.3d 418, 432-433 (6th Cir. 2021) (Nalbandian, J., concurring).

**A.    Standards Of Review**

The purpose of a preliminary injunction is to preserve the *status quo*.[14] *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, a court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable

---

[14] In this case, the *status quo* is the last uncontested status which preceded the pending controversy, when Noakes was a student in good standing at UC. The individual defendants sued in their official capacity would be compelled to remove any negative notation from Noakes' disciplinary records that resulted from the allegedly unconstitutional disciplinary process.

injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524, 532-533 (6th Cir. 2014). A court should balance all four factors, not necessarily giving dispositive weight to any one factor over the others.[15] *See York Risk Servs. Group v. Couture*, 787 F.App'x 301, 304-305 (6th Cir. 2019); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

The likelihood of success on the merits is a question of law that is reviewed *de novo* by this Court. *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 868 (6th Cir. 2022), *citing Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). A district court's determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).

## B.    The Eleventh Amendment Does Not Bar The Prospective Relief Sought By Noakes

The Eleventh Amendment does not bar suits for injunctive relief against state officials acting in their official capacities so long as the relief sought is prospective in

---

[15] This Court has observed that while all four elements should be considered, a failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's quest for a preliminary injunction." *Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020), *quoting Gonzales*, 225 F.3d at 625.

nature and designed to ensure future compliance with federal law. *Block v. Canepa*, 74 F.4th 400, 411 (6th Cir. 2023), *citing Ex Parte Young*, 209 U.S. 123, 155-56 (1908).

This Court has explicitly held that the Eleventh Amendment does not bar the injunctive relief sought in this case.  *Doe v. Cummins*, 662 Fed. Appx. 437, 444 (6th Cir. 2016).[16]   Other circuits agree. *See Doe v. Purdue Univ.*, 928 F.3d 652, 666-67 (7th Cir. 2019) (Eleventh Amendment did not prohibit an "injunction ordering university officials to expunge the finding of guilt from his disciplinary record"); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (negative entries in university records presented a continuing violation sufficient to overcome Eleventh Amendment immunity); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (request to expunge school record is not barred by the Eleventh Amendment).

---

[16] This Court recently reiterated that "expunging disciplinary records is, as a practical matter, prospective relief" which is not prohibited by the Eleventh Amendment. *Ashford v. Univ. of Michigan*, 89 F.4th 960, 969 (6th Cir. 2024).

**C.     Noakes Has A Substantial Likelihood Of Success On The Merits**

**1.     College And University Students Have A Constitutionally Protected Interest In Continued Enrollment**

For over fifty years, the law in this Circuit has been that the Due Process Clause is implicated by higher education disciplinary decisions.[17]  *Brown v. Strickler*, 422 F.2d 1000, 1002 (6th Cir. 1970) (school officials "were required to accord plaintiffs procedural due process throughout the disciplinary proceedings which resulted in their dismissal from the University"), *citing, inter alia, Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961).[18]  In a 1986 unpublished *per curiam* opinion, this Court affirmed a decision of district court finding that a student had "asserted a constitutionally protected interest" in continued enrollment.  *Jaksa v. Regents of Univ. of Michigan*, 787 F.2d 590 (6th Cir. 1986).   Nineteen years later, this Court, *citing, inter alia, Jaksa* simply

---

[17] The Supreme Court has not squarely held that students have a constitutionally protected interest in continued enrollment at a state college or university, but the precedents suggest an overwhelming likelihood that the Court would recognize such a right.  In *Goss v. Lopez*, 419 U.S. 565, 579 (1975), the Court held that high school students had a constitutionally protected liberty or property interest in their continued enrollment.  A significant basis for the Court's reasoning was that discipline could damage the students' academic reputation and "interfere with later opportunities for higher education and employment."  419 U.S. at 574-75.  Later decisions from the Court simply assumed the existence of a liberty or property interest.  *See e.g. Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 84-85 (1978).

[18] In *Dixon*, a case brought by a number of famed civil rights attorneys, including Justice Thurgood Marshall, the Fifth Circuit held that students have a liberty interest in their higher education. 294 F.2d at 157 ("The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing.").  The Supreme Court in *Goss* referred to *Dixon* as a "landmark decision." 419 U.S. at 576 n.8.

said, "in this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim*, 418 F.3d at 633 (citations omitted). This Court has reaffirmed this holding repeatedly in post-DCL cases. *Cummins*, 662 F.App'x at 445; *Miami Univ.*, 882 F.3d at 599; *Univ. of Cincinnati*, 872 F.3d at 399.

### 2.    UC Failed To Provide Noakes With The Constitutionally Required Fundamentally Fair Disciplinary Process

The basic due process requirements are notice and an opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254 (1970). The Supreme Court in *Goss* required that high school students facing a 10-day suspension, be "given some kind of notice and afforded some kind of hearing."[19]  *Goss*, 419 U.S. at 579. The punishment of expulsion from higher education is greater than a short suspension from high school; because a college or university student's interest is stronger, the process due to protect that interest may be more involved and this Court "conduct[s] a more searching inquiry." *Flaim*, 418 F.3d at 634.

Even before the wave of post-DCL litigation, this Court had recognized that *Goss* establishes a generalized bare minimum, describing the decision as the "*starting point* for analyzing alleged violations of students' procedural due process rights…" *Heyne v.*

---

[19] A common observation is that school disciplinary hearings are not criminal trials. *See e.g. Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017). This Court in *Flaim* cautioned that this is a "generalized, though unhelpful observation…" 418 F.3d at 635.

*Metro. Nashville Pub. Schs*, 655 F.3d 556, 564 (6th Cir. 2011) (emphasis supplied).[20]  In

*Flaim*, *Univ. of Cincinnati*, *Univ. of Miami*, *Endres*, and *Baum*, universities were required to

provide students with more specific procedural protections beyond mere 'notice and an

opportunity to be heard.'  As shown *infra,* the process provided by UC was inadequate

under this authority.[21]

      **a.**    **Standard**

Due process is "flexible and calls for such procedural protections as the

particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  The amount

of process due will vary according to the facts of each case and is evaluated largely

within the framework laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S.

319, 333 (1976). Under the *Mathews* framework, courts consider (1) the nature of the

private interest subject to official action; (2) the risk of erroneous deprivation under the

current procedures used, and the value of any additional or substitute safeguards; and

(3) the governmental interest, including the burden any additional or substitute

procedures might entail.  424 U.S. at 335.  Any *Mathews* analysis starts with the well-

established observation that the interest of students in avoiding potential damage to

---

[20] *Goss* did not address the due-process requirements for longer suspensions, noting only that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. at 584.

[21] The explicit application of the *Mathews* factors will generally be unnecessary because this Court conducted such an analysis in discussing the procedural requirements described in *Flaim*, *Univ. of Cincinnati*, *Endres,* and *Baum*.

reputations and later opportunities for education and employment is significant. *Goss*, 419 U.S. at 579.

### b.    UC Failed To Provide Noakes With Sufficient Notice

The Supreme Court requires that students be given notice of the charges against them. *Goss*, 419 U.S. at 581. This Court has required more than just a mere statement that a school policy was violated: "Notice satisfies due process if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638. *See also Dixon,* 294 F.2d at 158 ("notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion").

Understanding why the notice in this case did not provide Noakes with a meaningful opportunity to prepare requires working backwards. Noakes was found responsible for engaging in sexual activity with Roe when she was incapacitated "due to alcohol consumption." (Letter, R.29-2, PageID#596; *See also* Letter, R.29-2, PageID#599 ("it is reasonable to infer that Complainant was extremely intoxicated.").) Thus, the issue for this Court under the *Flaim* standard is: did Noakes have sufficient notice that Roe was alleging that she was she was incapacitated due to alcohol consumption to permit him a meaningful opportunity to prepare for the hearing? The answer, both at the investigative and hearing stage, is: no.

        i.        **The Initial Notice Was Too Vague To Permit Noakes A Meaningful Opportunity To Prepare For An Investigation**

The initial notice received by Noakes only referred to the Title IX Policy and failed to inform him exactly how he was alleged to have engaged in sexual assault. The notice provided to Noakes simply said he engaged in sexual activity with Roe without her consent. (Notice, R.30-3, PageID#1064.) The Title IX Policy contains numerous, very different, ways a violation this can occur. (Shaw Depo., R.31, PageID#1186-1187.) The term "without [Roe's[ consent," could mean *many* things: a "forcible" sexual assault;, sexual activity with a person who was "incapacitated" due to drugs; sexual activity with a person who was "incapacitated" due to intoxication; or something else altogether.[22]

The District Court correctly observed that the initial notice "included a specific address and a specific date and time" of the alleged misconduct. (Order, R.48, PageID#1888.) The District Court, however, failed to engage with the question of whether the initial notice was sufficient to place Noakes on notice that that Roe was alleging lack of consent due to incapacitation at all, much less incapacitation due to intoxication. Defendant's 30(b(6) designee admitted that the Notice failed to inform

---

[22] The complicated definition of consent in the UC policy contains 199 words. (Policy, R.1-3, PageID#104.) By contrast, a definition of consent in the Ohio Revised Code is only 21 words. O.R.C. 5924.120(A)(3).

Noakes that Roe was alleging that she was unable to consent because she was intoxicated:

> Q So let's go back to the Notice that was sent to Noakes. Is there anything in this Notice that would indicate to Noakes that Roe was alleging that she was unable to provide consent due to intoxication?
> A No.

(Marshall Depo., R.30, PageID#988.)[23]

This admission should have ended the due process inquiry, but other evidence in the record supports the conclusion that this notice was insufficient to inform Noakes about the nature of his alleged misconduct. UC's investigator acknowledged that there was no way for Noakes to tell the nature of the allegation he faced, admitting that the notice "could be for many things." (Shaw Depo., R.31, PageID#1191 (emphasis supplied).)[24] The hearing panel chair agreed during his deposition that "students or decision-makers understand" understand there are "very different ways that consent can be invalidated." (Vincent Depo, R.29, PageID#509 (emphasis supplied).) Noakes' advisor said in his deposition, "[I]n my opinion, that does not provide enough

---

[23] UC's designee later tried to make a *post hoc* excuse that the Formal Complaint is treated as "confidential." (Marshall Depo. PageID#989.) This is not true. The Formal Complaint is provided to respondents like John Doe when the investigation is completed.

[24] Another way to look at this is to observe that the initial notice was meaningless because it was over-inclusive. The investigator admitted that the Notice did not rule out the possibility that Roe was incapacitated in a myriad of ways that played no role in this case, such as disability, unconsciousness, or sleep. (Shaw Depo., R.31, PageID#1191-1192.)

information, especially prior to an interview to fully prepare…" because it "excludes specific details." (O'Reilly Depo., R.33, PageID#1573-1574.)

The notice provided by UC was insufficient under *Flaim* because it failed to include sufficient details known at the time and with sufficient time to prepare a response before any initial interview. The burden on UC of providing such a notice is minimal, as it is exactly what was required by the then-existing regulations. 34 C.F.R. 106.45(b)(2).

UC was aware that Noakes believed the notice was insufficient and could have easily resolved avoided this problem. Noakes repeatedly asked for clarification of the nature of his alleged misconduct.[25]  (Emails, R.29-14, PageID#977-979.)  The investigator denied this request, explaining only, "I believe all of the information that was required of me was included in the Notice." (Shaw Depo., R.31, PageID#1195.)

In terms of the *Mathews* factors, the investigator acknowledged that what Noakes asked for would not have imposed any additional expense or administrative burden for UC while, at the same time, would have provided him a benefit in helping him prepare for his interview. (Shaw Depo., R.31, PageID#1195-1196.) Courts have found that vague and insufficient notice create a fundamentally unfair process. In *VanNahmen v.*

---

[25] UC knew the answers; it simply *chose* not to share the information. Notably, Noakes was asking only for the information UC provides in other contexts under the Student Code of Conduct. (Code of Conduct, R.1-2, PageID#90 (notice should "inform the student… organization about the reported circumstances underlying the alleged violation(s)").)

*Dodge City Community College*, D.Kan. No. 17-CV-1174-EFM, 2018 U.S. Dist. LEXIS 132451, at *11 (Aug. 7, 2018), a court found that a student had successfully asserted a procedural due process claim based on insufficient notice where the letter from the school "only vaguely" referred to misconduct "without providing any context other than that it allegedly occurred 'on or about' two specific dates. In *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D.Mass. 2016), a court warned that a student should not be "expected to defend himself against [a] vague and open-ended charge." The court observed, "There is little practical difference between a school failing to inform the accused of the charge against him or… having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge."[26] *Id.* In *Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645, at *29 (May 8, 2017),[27] a court went further, noting that later providing the student with access to the investigative report detailing alleged misconduct still does not constitute adequate notice. The *Notre Dame* court observed that even providing detailed reports including witness statements may "not provide [the

---

[26] *Compare Faparusi v. Case W. Res. Univ.*, 711 F.App'x 269, 274 (6th Cir. 2017) (student was provided the factual basis for the complaint and was not "ambushed by the subject of the hearing").

[27] The *Notre Dame* decision was vacated as part of the settlement between the parties. This is of no consequence as the decision is cited not as binding precent but for its persuasive value.

student] with a statement of the particular conduct alleged to have been a violation of particular" policies. *Id*.

### ii.     Noakes Faced A Moving Target

The hearing panel found that there was insufficient evidence that Roe had been drugged.  The hearing panel then, *on its own initiative*, proceeded to follow a different theory about how Noakes may have violated the school's policy.  The hearing panel – without the urging of any a party – determined that Roe was too intoxicated to consent to sexual activity.  (Decision, R.1-4, PageID#136-138.)

Prior to the hearing, Roe's complaint and statements to the investigator make it clear that Roe consistently and exclusively alleged that she was incapacitated *because she had been drugged*.

- The initial report to the Title IX Office states: "while at a party, [Roe] was drugged and sexually assaulted by a fraternity member [Noakes.]  (Report, R.30-5, PageID#1108.)

- The Formal Complaint states, "I believe I was drugged by someone at this party."  (Report, R.30-5, PageID#1115.)

At the hearing, Roe repeated her allegation was that she had been drugged in response to a question from a panel member:

> Q … You're not necessarily implying that [Noakes] is the person who drugged you. Your claim is that there was something that led to drugs, and then this incident took place without consent. I just want to clarify that.
> A Correct.

(Hrg., R.37, at approx.. 1:29:48.)

30

The hearing panel's shifting rationale creates a constitutional due process problem. This Court will search the record in vain for any statement by Roe that she was intoxicated when she engaged in sexual activity with Noakes.

- Roe met with the investigator on July 28, 2022. The investigator was unable to testify that Roe told her during this meeting that she was intoxicated. (Shaw Depo., R.31, PageID#1190.)

- Roe's "Formal Complaint" states, "For most of the night, I was having a good time; I was getting tipsy, but I am very much aware of my limits, and I was not approaching my limit. I was walking around, dancing, and talking to people…" (Report, R.30-5, PageID#1115.) The investigator confirmed that this did not include an allegation that she could not consent because she was intoxicated. (Shaw Depo., R.31, PageID#1190.)

- Roe met with the investigator on August 30, 2022. According to the report, Roe said, "I was feeling tipsy but no signs of me thinking [to myself that] I need to slow down or stop." (Report, R.30-5, PageID#1078.) She added, ""I could tell I'd been drinking. I was tipsy but it wasn't like anything crazy." (*Id.*) When asked if this statement was enough to inform Noakes that Roe was alleging she was too intoxicated to consent to sexual activity, the investigator demurred. She testified, "I didn't make any inferences on her statement" and "I don't know that I necessarily have an opinion on that." (Shaw Depo., R.31, PageID#1194.)

- Roe met the investigator on September 9, 2022. Roe again never said that she was intoxicated. (Report, R.30-5, PageID#1085-1088.) When asked if this statement was enough to inform Noakes that Roe was alleging she was too intoxicated to consent to sexual activity, the investigator again demurred, testifying, "Again I'm not quite sure that I have an opinion on that." (Shaw Depo., R.31, PageID#1195.)

The notice, as the District Court observed, "included a specific address and a specific date and time." (Oder, R.48, PageID#1888.) The District Court failed to consider that Noakes faced a moving target when it came to how he actually violated

31

the school's policies. The precise level of detail required may differ in different circumstances, but due process *always* requires that a student be made aware of the nature of the charges facing him so that he may prepare a proper defense. *See Flaim, supra.* Here, Noakes went into the hearing believing that he likely was being accused of drugging Roe; he was able to beat that charge, but still came out of the hearing expelled because the panel, on its own, decided that Roe was intoxicated.

This lack of notice was meaningful and led to a less reliable outcome. Based on everything he was provided before the hearing, Noakes had no reason to investigate or to procure witnesses or other information to counter information alleging that Roe had been intoxicated. Noakes' defense was based on responding to the allegation that Roe had been drugged. He started his statement to the hearing panel as follows: "The implication the complainant filed with the school accusing me of being a rapist who drugged his victim…. And the idea of me being a drugging rapist is an absolute falsehood." (Hrg., R.37, Approx.. 2:09:20.) Noakes' advisor explained that defending against a claim of drug assisted assault is very different from defending against a claim of intoxication. (O'Reilly Depo., R.33, PageID#1574.) He testified he prepared for the case differently because he believed the allegation was drug related: "I think my primary focus was drugs before alcohol… Drugs was what I thought the primary focus was with alcohol being an involvement in the night." (O'Reilly Depo., R.33, PageID#1576).)

32

The Seventh Circuit, in *Dietchweiler v. Lucas*, 827 F.3d 622 (7th Cir. 2016), warned against schools creating a moving target in the notice provided to students. In *Dietchweiler*, the notice provided to the student alleged misconduct on one day, while the hearing focused on actions that occurred the day before. The court found that this minor discrepancy did not preclude the student from presenting his defense. The court warned, however that conduct like UC engaged in, where the substance of the charge changes, would raise constitutional concerns:

> if the variance between the notice given [the student] and the substance of the hearing had in fact hampered his ability to fairly present his defense to the charges, this would be a different case. It is easy to imagine how such a moving target could fail to provide adequate notice and opportunity to be heard…

827 F.3d at 630. This is the precise problem that motivated a district court in this Circuit to grant an injunction in *Nokes v. Miami Univ.,* S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017). In *Nokes,* after the student had been required to submit a statement and other evidence to the investigator, he was told that the allegations might be based on a new theory of lack of consent. The *Nokes* court found that the student had a substantial likelihood of success on a due process claim for preliminary injunction purposes because the notice from the school created a "moving target." 2017 U.S. Dist. LEXIS 136880, at *34. *Cf. Doe v. Virginia Polytechnic Inst.*, W.D.Va. No. 7:21-cv-378, 2024 U.S. Dist. LEXIS 60513, at *38 (Apr. 2, 2024) (notice insufficient where student did not have enough time to prepare).

### c.    The Hearing Panel Relied Upon Undisclosed And Unreliable Expert Evidence

The hearing panel relied upon undisclosed scientific evidence in the form of information from a website to estimate Roe's blood alcohol level.  This was a substantial procedural due process error under two separate lines of cases from this Court which require that evidence be both reliable and disclosed in advance of hearings.

### i.    The Use Of The BAC Calculator Violated This Court's Requirement That Evidence Be Disclosed

The hearing panel's reliance on information from an outside source without disclosing this information to Noakes or his advisor is contrary to this Court's holdings in *Miami Univ* and *Endres*.  These cases establish that a student's due process rights are violated when a decision maker relies on information from an outside source without disclosing this information to the student prior to the hearing.

This Court in *Miami Univ.* held that the Fourteenth Amendment requires that evidence used by a school's decision-makers to adjudicate the claims against a student be provided to the student.[28]  882 F.3d at 603.  In *Miami Univ.*, the student had alleged that the school refused to provide the student with a copy of an investigative report or

---

[28] The District Court acknowledged that "it is certainly true that due process requires the disclosure of evidence."  (Order,R.48, PageID#1890.)  The District Court analyzed whether the use of this material violated UC's rules but, respectfully, failed to engage with whether, as in *Endres,* this failure to disclose is a due process violation irrespective of whether the disclosure was required by school rules.  A student's "rights are dictated by the Constitution, 'not internal school rules or policies.'" *Univ. of Cincinnati*, 872 F.3d at 407, *quoting Cummins*, 662 F. App'x at 445 n.2.

the evidence against him contained within that report. This Court said, "to the extent any of the evidence contained within this report was used by the Administrative Hearing Panel to adjudicate [the student's] claim, and [the student] was not provided this evidence, he has alleged a cognizable due-process violation. Similarly, in *Endres,* a medical student who had been dismissed for cheating claimed that he was not permitted to view key evidence against him before a hearing, including a statistical evidence of students tests showing that there was a slim chance that two students would have identical wrong answers. This Court explained the essential due process problem: "Without knowing that the… Analysis even existed, [the student] could not have responded…," and without knowing the precise evidence a hearing panel would rely upon, the student could not present his side of the story. 938 F.3d at 301-302.[29]  *See also Purdue*, 928 F.3d at 663 ("withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair").

The deposition testimony of the chair falls squarely within the holdings of *Miami Univ.* and *Endres*:

---

[29] Similar facts are found in *Doe v. Alger*, 228 F. Supp. 3d 713 (W.D.Va.2016).  As in this case, the student in *Alger* had been disciplined for engaging in sexual activity with another student who was allegedly incapacitated.  The accuser claimed that her use of Prozac had affected her levels of intoxication.  The court granted summary judgment to the student, finding the hearing panel impermissibly relied on a statement from a social worker regarding the effects of mixing Prozac and alcohol that had not given to the student.  The court noted that had the student known of this evidence, "he might have tried to submit additional materials of his own in response."  228 F. Supp. 3d at 731-732.

> Q …You didn't tell the parties at any point that you were going to refer to this website in reaching your conclusions; did you?
> A No.

(Vincent Depo., R.29, PageID#522.)  And:

> Q …my client didn't have any opportunity to present evidence to rebut this and say, "No, it's not really validating at all"?
> A No more so than he had an opportunity to rebut any of the other panel's deliberative exercises.
> Q Was he given any opportunity to respond to the information you received from this website before you used it?
> A No.

(Vincent Depo., R.29, PageID#523.)  Even UC's appeals panel admits that "it was inappropriate for the [hearing panel] to use an outside website to calculate blood alcohol content without providing the parties the opportunity to review and provide feedback to the information."  (Appeal Decision, R.35, PageID#1728.)

The District Court excused the failure to disclose this evidence by suggesting that the decision would have been the same regardless of whether the BAC calculator was considered.[30]  (Order.R.48, PageID#1890-91.)  This excuse is inconsistent with the Supreme Court's due process jurisprudence explaining that procedural due process considers not the justice of a deprivation, but only the means by which the deprivation

---

[30] The District Court's claim is supported only by a self-serving statement from the chair of the hearing panel.  The District Court ignored the deposition testimony that this evidence was used to bolster the credibility of Roe.  (See Vincent Depo, R.29, PageID#522 ("it validates what complainant said she experienced"); Vincent Depo., R.29, PageID#523 ("it validated the panel's findings or appeared to be consistent with the panel's findings…").  The ability to test evidence that bolsters or detracts from credibility is at the heart of this Court's decisions in both *Baum* and *Univ of Cincinnati.*

36

occurred. In *Goss*, the Court explained that a school's adjudication of the allegations against a student without adequate due process "immediately collides with the requirements of the Constitution," without considering the merits of the decision. 419 U.S. at 574-75. In *Carey v. Piphus*, 435 U.S. 247, 266-267 (1978), the Court considered a suspension of students without due process; no finding was made as to whether the students would have been suspended if they had received adequate procedural due process. The *Carey* Court rejected the argument that a court should consider whether the suspensions would ultimately have been imposed:

> Even if [the students'] suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process… the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions… because of the importance to organized society that procedural due process be observed.

435 U.S. at 265-66. *See also Zinermon v. Burch*, 494 U.S. 113, 126 n. 11 (1990) ("The Court in *Carey* explained that a deprivation of procedural due process is actionable . . . without regard to whether the same deprivation would have taken place even in the presence of proper procedural safeguards."); *Miami Univ,* 882 F.3d at 603 (holding that that a due process violation occurs when the "any" of the undisclosed evidence "was used by the" hearing panel in reaching a decision). *Cf. Nokes,* 2017 U.S. Dist. LEXIS 136880, at *29 ("this Court is not persuaded… that Sixth Circuit plaintiffs are required to show that the 'outcome' of the hearing would have been different absent the alleged Constitutional violations"); *Plummer v. Univ. of Houston,* 860 F.3d 767, 779 (5th Cir. 2017)

(Jones, J, dissenting) (in student discipline case noting that "the result of a deprivation of liberty or property does not justify the procedural means").

>    ii.   **The Use Of The BAC Calculator Violated This Court's Requirement That Evidence Relied Upon At An Administrative Hearing Must Be Reliable**

The hearing panel's reliance on unreliable information is contrary to this Court's holding in *Woods, supra.* This case establishes that "the touchstone of due process is reliability." In *Woods,* this Court held, "assuming, *arguendo*, that hearsay evidence can constitute substantial evidence to support [an administrative] decision, the evidence must be at the very least reliable and of proven probative value." 515 F.App'x at 483-484. *See also* Laurence H. Tribe, *American Constitutional Law*, § 10-13, at 714 (2d ed. 1988) (noting that the "value [of] procedural safeguards" is primarily determined by their potential to minimize "factual error in the application of the relevant substantive rules").

The BAC Calculator was not reliable. A Forensic Toxicologist submitted an affidavit describing how this evidence is highly unreliable; no evidence in the record supports the reliability of this evidence. (Plotnick Aff., R.3-1, PageID#208-209 ("The information on this website is not accurate or reliable.").) The Panel used this information while acknowledging that "Calculating an individual's blood alcohol content (BAC) is an imprecise exercise, and measurements based on limited inputs like gender, weight, number of drinks, and timespan produce only rough approximations." (Decision, R.29-2, PageID#595.)

The testimony of the hearing panel chair explains why this is not simply, as the District Court suggested, a 'procedural error.' (Order, R.48, PageID#1890.) This is an independent and substantial due process error because undisclosed evidence is unreliable evidence. The hearing panel Chair was asked in his deposition about prior training he provided which instructs: "Do not turn to any outside evidence"; and "Decisions must be based only upon information evidenced in the investigation report or presented at the hearing." (Training, R.29-10, PageID#790; Training, R.29-11, PageID#925.) He acknowledged that reliance on evidence outside of the hearing was unfair and could lead to unreliable outcomes:

> Q Do you think it's fair and likely to lead to reliable results if the decision-maker relies upon information that was not in the investigation report or presented at the hearing
> A I think the decision-maker should do as this is outlined.
> Q That decision-maker should not turn to any outside evidence?
> A Correct.
> Q And the reason they shouldn't turn to outside evidence to close the loop here – The reason they shouldn't turn to outside evidence is because it is unfair and might not lead to reliable results?
> A It would -- Sure.

(Vincent Depo., R.29, PageID#510.)

### d. The Entire Process, Including Investigation And Hearing, Was Fundamentally Unfair

The core of this Court's university disciplinary hearing jurisprudence is the idea that a school's entire process must be fundamentally fair. *Flaim*, 418 F.3d at 635 fn.1 ("a public university student who is facing serious charges of misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing"); *Univ. of*

39

*Cincinnati*, 872 F.3d at 396 ("The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process.").[31]

### i.    The Delays In This Case Prejudiced Noakes

This Court has previously noted that UC's failure to act diligently in investigating allegations of sexual conduct by students was "troubling." In *Univ. of Cincinnati*, this Court observed that UC, "waited a month to interview [the alleged victim], another four months to notify [the student] of her allegations, and yet another four months to convene the [disciplinary] hearing." 872 F.3d at 403. This Court found UC's actions in that case troubling, in part, because UC's Title IX Policy noted, like it still does, that delay may limit the University's ability to investigate. This Court added: the "time-sensitive factors [that] may 'impair an investigation'… did not motivate the University." *Id.* at fn. 2.

In this case, UC continued this troubling conduct. UC was aware of the allegations in March, but Noakes was not informed about the allegations until over four months later in August. UC's failure to begin an investigation when the school first learned of the allegations made it difficult, if not impossible, for Noakes to defend

---

[31] The District Court observed that school disciplinary committees are entitled to a presumption of impartiality. (Order, R.48, PageID#1888, *citing Cummins*, 662 F. App'x at 449.) That presumption is inapplicable here for two reasons: (i) that presumption applies to committees composed of educators, not consultants, because the "educational process is not by nature adversarial…" *Horowitz*, 435 U.S. at 90, *quoting Goss*, 419 U.S. at 594; and (ii) UC abandoned the presumption by failing to diligently and seriously evaluate the objections lodged by Noakes. (Email, R.30-7, PageID#1159; Email, R.30-8, PageID#1163; 30(b)(6) Depo., R.30, PageID#998-999.)

himself.  (Pl. Depo., R.32, PageID#1402.)    Nothing was done until a "formal" complaint was submitted – and even then UC waited three *more* weeks to send out notice.[32]  The investigator waited additional weeks to begin meeting with witnesses and then spent months to complete a handful of relatively short meetings.[33]  This delay made it difficult, if not impossible, for Noakes to defend himself.  As the Title IX Policy acknowledges, "Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence…"  (Policy, R.1-3, PageID#113.) Noakes' advisor, an experienced form sex-crimes prosecutor, explained that "Noakes was prejudiced in his ability to defend himself because of the significant delays in this matter…"  (O'Reilly Aff., R.3-2, PageID#212.)[34]

---

[32] The District Court said that "context is critical here: although the OGEI report was filed on March 31, Roe did not submit a signed formal complaint to UC officials until July 26."  (Order, R. 48, PageID#1887.)  Even if the difference between a "complaint" and a formal complaint" has constitutional significance, the District Court failed to consider that UC waited three weeks before providing Plaintiff with notice merely because the investigator went on vacation, and then *still* did not proceed with deliberate speed to investigate or resolve the matter.  (Shaw Depo., R.31, PageID#1190.)

[33] Notably, the investigator did not actually investigate as lawyers and judges would understand that term.  She made no effort to obtain evidence from independent sources.    (Shaw Depo., R.30, PageID#1180-1182.  *Compare* Training, R.31-2, PageID#1319-1320 (investigator should work with law enforcement to collect and preserve evidence and should create and keep detailed witness questions and notes).) Instead, she described her passive role as "just a person who collects the information" provided by students.  (Shaw Depo., R.30, PageID#1205.)

[34] The delay when Plaintiff asked for a continuance due to counsel's cancer treatments does not change the conclusion.

ii.    **Noakes Was Denied Access To Crucial Evidence That Would Have Permitted Effective Cross-Examination**

In *Univ. of Cincinnati* and *Baum*, this Court held that where the credibility of the accuser is at issue, a denial of effective cross-examination is a denial of due process. 872 F.3d at 402; 903 F.3d at 575. Here, Noakes couldn't effectively cross-examine Jane Roe on two critical issues: her credibility (specifically, her motive to lie or exaggerate); and her medical treatment. This particular situation demanded the procedural protection of UC either limiting Roe's testimony or providing Noakes with the necessary information to impeach a critical witness.

Noakes was denied access to evidence in the school's possession concerning the benefits or accommodations that Roe received as a result of her claim to have been a victim of sexual assault.[35] The investigator acknowledged in her deposition that Roe was provided with supportive measures, including accommodations related to her academic standing.[36] (Shaw Depo. R.31, PageID#1188.) Such evidence would have directly impacted Roe's credibility, as accommodations would be a reason for her to fabricate or exaggerate her claims. The hearing panel should have been permitted to

---

[35] Appellant is not asking the Court to hold that a school is always required to disclose benefits or accommodations. Instead, like the narrowing construction provided by this Court in *Univ. of Cincinnati,* such an inquiry is only required "in a case that turns on credibility." 872 F.3d at 402.

[36] The investigative report states that Roe did not request any supportive measures at the time of her interviews in August/September 2022. This may have been an effort by the investigator to hide this information; the Investigator was more equivocal about this when under oath at her deposition. (Shaw Depo. R.31, PageID#1189.)

consider these benefits in weighing Roe's credibility. In *Purdue Univ.*, the Seventh Circuit found a due process violation where there was a failure to "probe whether… evidence was reason to disbelieve" the accuser, even though the decision-maker "may have concluded in the end that [the student's] impeachment evidence did not undercut [the accuser's] credibility." 928 F.3d at 664. In *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 663 (S.D.Ohio 2016), a court in this Circuit noted that this is "critical evidence" because in a "case where the panel's decision hinged on a credibility decision" evidence of accommodations or benefits might "impeach [an] accuser's credibility." And in *Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:19-cv-1467, 2020 U.S. Dist. LEXIS 85708 (May 15, 2020), a student had alleged that "the University and the University's investigators failed to obtain available exculpatory evidence." The court concluded that "Such allegations cast an articulable doubt on the outcome of the disciplinary proceeding…" 2020 U.S. Dist. LEXIS 85708, at *27.

Noakes also was denied the ability to effectively cross-examine Roe about her medical exam. The hearing panel permitted Roe to testify about the results of the medical exam and present selected photographs.[37] (*See e.g.* Hrg., R.37, approx. 1:05:15, 1:38:05.) Without discovery or disclosure of the complete medical records, Noakes had no ability to impeach this testimony. (O'Reilly Aff.,R.3-2, PageID#211-212.) This was

---

[37] The Title IX regulations prohibit UC from *requiring* a student to provide records; the regulations do not prevent the school from *asking* for them or limiting testimony describing their contents. 34 C.F.R. 106.45(b)(1)(x).

particularly problematic because Roe's testimony about test results was "misleading." (Plotnick Aff., R.3-1, PageID#210.)  True, Roe was not *required* to produce such records – but in that case the hearing panel should have not permitted any testimony or evidence about the examination.[38]

### iii.    The Perplexing Decision Permits An Inference Of Bias

This Court has held that "the merits of the decision itself, as a matter of common sense, can support an inference of… bias." *Doe v. Oberlin College*, 963 F.3d 580, 588 (6th Cir. 2020).  This Court relied, in part, on a decision by Judge, now Justice, Barrett in *Purdue* reasoning that a "perplexing" decision can support an inference of bias.  928 F.3d at 669.[39]

The decision here was perplexing because the hearing panel reached conclusions that were contradicted by Roe's testimony and statements.   The hearing panel concluded that Roe had not been drugged but was too intoxicated due to alcohol to consent to sexual activity.  However, Roe testified that she was drugged, and not drunk: "I've consumed alcohol enough times to know that and I was not just drunk. There was something else that contributed to the effects that I had."  (Hrg., R.37, at approx.

---

[38] Alternatively, the hearing panel could have drawn an adverse inference that where relevant information is in the possession of one party and not produced, the information would be harmful to the party which failed to produce it.

[39] The observations in *Oberlin* and *Purdue* arose in the context of Title IX, and not due process claims.  The question under Title IX was whether procedural irregularities could lead to an inference of *gender* bias.  The same analysis applies to bias claims under the Due Process Clause since bias for *any* reason would be constitutionally impermissible.

0:49:16.)  Roe's testimony was consistent with her statements during the investigation that she was not drunk.  *See supra* at 31.  Bias may be inferred because the hearing panel never resolved this inconsistency.  The hearing panel concluded, Roe's "description of her state of intoxication was ultimately determined to be credible."  (Decision, R.29-2; PageID#596.)  Yet the hearing panel never reconciled Roe's repeated statements that she was not drunk or explained why the hearing panel found those statements to not be credible.  *Cf. Miami Univ.,* 882 F.3d at 593 (noting that an "unresolved inconsistency in [alleged victim's] statement" helped created doubt as to the accuracy of the decision).

The almost precise same situation arose in a recent decision in the Southern District of Indiana.  *Erny* v. *Board of Trustees of Indiana Univ.*, S.D. Ind. No. 1:22-cv-00524 (June 3, 2024).[40]  In *Erny*, a female student alleged that a male student had drugged and sexually assaulted her.  As in this case, throughout IU's disciplinary process, the female student insisted that she was not drunk but must have been drugged.  And, as in this case, the panel concluded that the female student had not been drugged but, instead, proceeded to find she was too drunk to consent to sexual activity.   The *Erny* court, applying the *Purdue* standard, concluded that this decision was so "perplexing" that it cast doubt on the accuracy of the finding and could support an inference of bias.  The court reached this conclusion because the panel failed to account for or explain

---

[40] Available at
https://storage.courtlistener.com/recap/gov.uscourts.insd.199052/gov.uscourts.insd.199052.98.0.pdf

significant inconsistencies in the statements the female student presented to the

investigators or hearing panel.  The court explained:

> Despite concluding Plaintiff did not drug [the female student] and despite
> receiving [the female student's] statements that she would not have been
> incapacitated by the amount of wine she drank, the panel nonetheless
> concluded [the female student] was incapacitated by the wine. The panel
> did not explain why it chose to largely credit [the female student's] story
> of the evening but not find credible her assertions that she could not have
> been (and, on a regular basis, was not) incapacitated by the amount of
> wine she drank.  The panel… did not, apparently, fully explore or explain
> [the female student's] credibility or inconsistency.

*Id.* at 15-16.  *Cf. Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020)

(finding evidence of bias where panel found alleged victim to be intoxicated despite

investigator's conclusion otherwise).

### iv.    The Multiple Procedural Errors Permit An Inference Of Bias And Created A Fundamentally Unfair Process

This Court has held that "Procedural irregularities provide strong support for [a

student's] claim of bias…"  *Doe v. Oberlin College*, 963 F.3d 580, 587 (6th Cir. 2020).  *See*

*also Baum*, 903 F.3d at 586 (allegation of adjudicator bias based on conduct of hearing,

combined with the external pressure facing the university, made student claim of bias

plausible).  Although the procedural irregularities may not, standing alone, rise to the

level of a constitutional violation, the "accumulation of mistakes" may result "in a

violation of procedural due process."  *Doe v. Rector & Visitors of George Mason Univ.*, 149

F. Supp. 3d 602, 621-22 (E.D.Va. 2016), *quoting Furey v. Temple Univ.,* 884 F.Supp.2d 223,

259 (E.D.Pa. 2012).

Three major procedural irregularities occurred.

First, UC had agreed to remove a TNG employee, Brett Sokolow, from the hearing panel due to a conflict of interest. UC's 30(b)(6) deponent testified, "I believed that once he had been removed that he would not have a role in this matter moving forward." (30(b)(6) Depo., R.30, PageID#995.) Yet, Sokolow edited, provided substantive comments on, and ultimately "approved" the decision prepared by the hearing panel. (Email, R.29-7, PageID#611; Email, R.29-5, PageID#609; Draft, R.29-9, PageID#631.) UC's 30(b)(6) deponent declined when given an opportunity to defend this as appropriate or permissible. (30(b)(6) Depo., R.30, PageID#995.)

Second, the hearing panel commented negatively on Noakes' decision to not provide a statement to the investigator until he received more details about the allegation, even though that was his right. The decision states, "Respondent's credibility was weakened in part because he did not provide any statements during the course of the grievance process prior to the hearing." (Letter, R.29-2, PageID#597.) This was exacerbated when the chair cut off good faith questions from Noakes' advisor based on the fact that "evidence" to support the questions "was not in the record." (Hrg, R.37., at approx. 1:51:21.) He admitted in a deposition that this was error. (Vincent Depo., R.29, PageID#520.)

Third, UC did not comply with the timelines in its policy. The Title IX Policy states that "from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business

days." (Policy, R.1-3, PageID#114.)  Ninety business days from when the Title IX Office first became aware of the allegations against Noakes on March 31, 2022, would be approximately August 9, 2022.  Ninety business days from when a Formal Complaint was submitted to the Title IX Office on July 26, 2022 would be approximately December 5, 2022.  March 23, 2023 – when the Outcome Letter was sent – is not even close.  *See Oberlin*, 963 F.3d at 587 (bias inferred in part from failure to adhere to timelines).

> ### v.    The Consultants Used On The Hearing And Appeals Panels Were Biased

Due Process requires that a decisionmaker be neutral. *See Williams v. Pennsylvania*, 571 U.S. 1, 8 (2016) (due process requires "'an absence of actual bias' on the part of a judge"), *quoting In re Murchison*, 349 U.S. 133, 136 (1955).  A due process violation may be established without a showing of actual bias where "a court . . . determin[es] from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

This Court has stated a party is not required to prove "actual partiality" to carry this burden. *Roadway Express v. Reich*, 6th Cir. No. 93-3787, 1994 U.S. App. LEXIS 22924, at *13 (Aug. 22, 1994).  This Court has explained that in an administrative setting, the concept of an unbiased adjudicator "requires the appearance of fairness and the absence of a probability of outside influences on the adjudicator; it does not require

48

proof of actual partiality."[41] *Utica Packing Co. v. Block*, 781 F.2d 71, 77 (6th Cir.1986). *See also Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989) ("The administrative process requires the appearance of fairness and the absence of a probability of outside influences on the adjudicator; it does not require proof of actual partiality.").

Panel members should wear only one hat: that of the neutral decision-maker or as advocates for schools; they cannot wear both. The hearing panel consisted of employees of an organization that provides training and expert advice to educational institutions in general, and UC in particular. (Vincent Depo., R.29, PageID#500; Trainings, R.30-9, PageID#1166.) That organization routinely provides expert opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct.[42] The appeals panel members work for an affiliate of Bricker & Eckler, a firm that not only provides

---

[41] The District Court relied on *Cummins*, where this Court suggested that "[a]ny alleged prejudice on the part of the [decisionmaker] must be evident from the record and cannot be based on speculation or inference,'" 662 F. App'x at 450 *quoting Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987). *Cummins* did not overrule *Utica Packing*, where this Court said that "It is of no consequence for due process purposes that" the aggrieved party "were unable to prove actual bias on the part of" the decision-makers. 781 F.2d at 78 (6th Cir.1986). This Court relied on *Utica Packing* in a recent decision, noting: "While he need not prove 'actual partiality,' someone arguing that a proceeding violated his due process rights under *Withrow* must show that the proceeding did not appear fair…" *In re Justice*, 6th Cir. No. 20-5479, ___ F. App'x ___, 2021 U.S. App. LEXIS 25941, at *14 (Aug. 26, 2021), *quoting Utica Packing*.

[42] https://www.tngconsulting.com/consulting/expert-services/expert-witness-and-litigation-support/.

training, legal representation, and expert advice to educational institutions, including UC, but also represents schools in responding to Title IX claims by students.[43]

Even though Plaintiff was not required to show "actual partiality" to carry his burden, Plaintiff had a substantial likelihood of success of meeting that more demanding standard. The chair of the hearing panel showed actual bias when he was quoted in the New York Times demonstrating hostility to the entire idea of cross-examination that this Court in *Baum* and *Univ. of Cincinnati* held are essential to a fair process:

> Joseph Vincent, an advisory board member of the Association of Title IX Administrators, expressed skepticism about the value of adversarial cross-examinations in campus sexual assault hearings. He said they are meant to test the credibility and demeanor of the accuser under pressure, but they are basically worthless at getting to the truth. The practice rewards those who can hire the "flashiest attack dog attorney money can buy," he said.

*How a Yale Student's Rape Accusation Exposed Her to a Defamation Lawsuit*, NY Times, Sept. 17, 2023. And In addition, the questioning by the hearing panel of Roe suggested that the panelists had made up their minds. Panelists appeared to be helping Roe with her story and assumed that she should have been scared of Noakes. One asked: "But we're really trying to get the clearest statement from you possible. So keep restating it." (Hrg,

---

[43] *See e.g. Rose v. Kenyon College,* S.D. Ohio No. C2-00-1299 & C2-00-1378*; Galloway v. Chesapeake Union Exempted Vill. Schs. Bd. of Educ.*, S.D. Ohio No. 1:11-cv-850; *Doe v. Kenyon College*, S.D. Ohio No. 2:20-cv-4972; *Navarro v. Fla. Inst. of Tech., Inc.*, M.D. Fl. No. 6:22-cv-1950.

R.37., at approx. 2:01:45.)   Another panelist said to Roe that a question was "not because what you're saying doesn't make sense, it's just so that we can be as clear as possible."  (Hrg, R.37., at approx.. 2:04:53.)[44]

## D.    Noakes Will Suffer Irreparable Harm In The Absence Of Injunctive Relief

This Court has held that school discipline constitutes irreparable harm because of the risk of damage to a student's academic and professional reputations and the adverse effect on a student's ability to enroll at other institutions of higher education and to pursue a career.  *Univ. of Cincinnati,* 872 F.3d at 407 ("Were we to vacate the injunction, [the student] would be suspended… and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief.").  *See also Cummins*, 662 F.App'x at 445 (noting that "adverse disciplinary decision did, and continues to, impugn [a student's] reputation and integrity…")   This, combined with the fact that the violation of constitutional rights is presumed to constitute irreparable harm, is sufficient to satisfy the requirement of irreparable harm. *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002),

---

[44] UC failed to make the trainings undertaken by all decisionmakers available on its website as required by federal regulations.  34 C.F.R. 106.45(b)(10)(i).

**E.     The Balance Of The Equities, Public Interest, And Minimal Harm To Third Parties Support The Issuance Of An Injunction**

While Courts have been appropriately deferential to schools in disciplinary matters, this deference is not without limits, particularly when the alleged misconduct is, as in this case, better characterized as "disciplinary" and not "academic." *See Endres.*, 938 F.3d 281 (distinguishing between academic and disciplinary concerns for due process analysis).[45]

An injunction will not cause any harm to third parties or UC.  UC remains able to enforce its rules and regulations in a manner consistent with this Court's precedents. Noakes is now enrolled at a separate school and was permitted to remain on campus for over a year after the report, so there can be no suggestion that Noakes poses a risk to Jane Roe or other students on the campus.  (Pl. Depo., R.32, PageID#1392.)

An injunction is also in the public interest.  This Court, in affirming the injunction in *Univ. of Cincinnati,* said, "it is always in the public's interest to prevent a violation of an individual's constitutional rights… while the public has a competing interest in the enforcement of Title IX, that interest can never override individual constitutional rights." 872 F.3d at 40, *citing Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016).

---

[45] Other courts have granted preliminary injunctive relief in situations where students had credible evidence that a school employed an unfair disciplinary process.  (*See* Memo, R.3, PageID#189-191 (collecting cases).)

**F.    Nominal Bond Should Be Required**

UC is an educational institution. Accordingly, because money is not an issue for the Defendants and the school is not likely to suffer any potential losses if an injunction is granted, this Court should not require a bond. *Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d 704, 713 (S.D.Ohio 2016) (setting nominal bond of $1 for preliminary injunction against UC).

**CONCLUSION**

The Order Denying the Motion for Preliminary Injunction should be reversed. Because the four factors required to grant a preliminary injunction are apparent on the record, this Court should cause the preliminary injunction to issue with nominal bond required.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and 6 Cir R. 32(a) I hereby certify that this document complies with the type-volume limitation. This document contains 12,817 words, excluding the portions listed in 6 Cir. R. 32(b), as calculated by Microsoft Word.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

54

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 1 | COMPLAINT | 5/15/23 | 1 - 66 |
| 1-2 | STUDENT CODE OF CONDUCT | 5/15/23 | 68-102 |
| 1-3 | TITLE IX POLICY | 5/15/23 | 103-129 |
| 1-4 | OUTCOME LETTER | 5/15/23 | 130-144 |
| 1-5 | APPEAL | 5/15/23 | 145-153 |
| 1-6 | APPEAL DECISION | 5/15/23 | 154-167 |
| 3 | MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION | 5/15/23 | 171- 206 |
| 3-1 | AFFIDAVIT OF PLOTNICK | 5/15/23 | 207-210 |
| 3-2 | AFFIDAVIT OF O'REILLY | 5/15/23 | 211-213 |
| 29 (SEALED) | DEPOSITION OF JOSEPH VINCENT | 9/14/23 | 496-569 |
| 29-1 (SEALED) | EXHIBIT: PROTECTIVE ORDER | 9/14/23 | 570-587 |
| 29-2 (SEALED) | EXHIBIT: OUTCOME LETTER | 9/14/23 | 588-601 |
| 29-3 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 602-604 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 29-4 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 605-608 |
| 29-5 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 609 |
| 29-6 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 610 |
| 29-7 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 611-612 |
| 29-8 (SEALED) | EXHIBIT: DRAFT | 9/14/23 | 613-624 |
| 29-9 (SEALED) | EXHIBIT: DRAFT | 9/14/23 | 625-632 |
| 29-10 (SEALED) | EXHIBIT: TRAINING | 9/14/23 | 633-807 |
| 29-11 (SEALED) | EXHIBIT: TRAINING | 9/14/23 | 808-946 |
| 29-12 (SEALED) | EXHIBIT: POLICY | 9/14/23 | 947-973 |
| 29-13 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 974-978 |
| 29-14 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 977-979 |
| 30 (SEALED) | DEPOSITION OF BLEUZETTE MARSHALL (30(B)(6) WITNESS) | 9/14/23 | 980-1026 |
| 30-1 (SEALED) | EXHIBIT: DEPOSITION NOTICE | 9/14/23 | 1027-1028 |
| 30-2 (SEALED) | EXHIBIT: STUDENT CODE OF CONDUCT | 9/14/23 | 1029-1063 |
| 30-3 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1064-1066 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 30-4 (SEALED) | EXHIBIT: FEDERAL REGULATIONS | 9/14/23 | 1067-1073 |
| 30-5 (SEALED) | EXHIBIT: INVESTIGATIVE REPORT | 9/14/23 | 1074-1155 |
| 30-6 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1156-1158 |
| 30-7 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1159-1162 |
| 30-8 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1163-1165 |
| 30-9 (SEALED) | EXHIBIT: TRAINING MATERIALS | 9/14/23 | 1166 |
| 31 (SEALED) | DEPOSITION OF MORGAN SHAW | 9/14/23 | 1167-1238 |
| 31-1 (SEALED) | EXHIBIT: TRAINING MATERIALS | 9/14/23 | 1239-1249 |
| 31-2 (SEALED) | EXHIBIT: TRAINING MATERIALS | 9/14/23 | 1250-1370 |
| 31-3 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1371 |
| 31-4 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1372 |
| 31-5 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1373 |
| 31-6 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1374 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 31-7 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1375 |
| 31-8 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1376 |
| 31-9 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1377 |
| 31-10 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1378 |
| 31-11 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1379 |
| 31-12 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1380-1381 |
| 31-13 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1382 |
| 31-14 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1383-1384 |
| 31-15 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1385 |
| 31-16 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1386 |
| 31-17 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1387-1388 |
| 32 (SEALED) | DEPOSITION OF JOHN NOAKES | 9/14/23 | 1389-1420 |
| 32-1 (SEALED) | EXHIBIT: COMPLAINT | 9/14/23 | 1421-1487 |
| 32-2 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1488-1500 |
| 32-3 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1501-1504 |
| 32-4 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1505-1507 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 32-5 (SEALED) | EXHIBIT: INVESTIGATIVE REPORT | 9/14/23 | 1508-1541 |
| 33 (SEALED) | DEPOSITION OF SCOTT O'REILLY | 9/14/23 | 1542-1591 |
| 33-1 (SEALED) | EXHIBIT: COMPLAINT | 9/14/23 | 1592-1658 |
| 33-2 (SEALED) | EXHIBIT: AFFIVDAVIT | 9/14/23 | 1659-1661 |
| 33-3 (SEALED) | EXHIBIT: SUBPOENA | 9/14/23 | 1662-1668 |
| 33-4 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1669 |
| 33-5 (SEALED) | EXHIBIT: EMAILS | 9/14/23 | 1671-1673 |
| 33-6 (SEALED) | EXHIBIT: FEDERAL REGULATIONS | 9/14/23 | 1674-1709 |
| 33-7 (SEALED) | EXHIBIT: US CODE | 9/14/23 | 1062-1102 |
| 34 (SEALED) | EXHIBIT: APPEAL | 9/14/23 | 1710-1718 |
| 35 (SEALED | EXHIBIT: DECISION ON APPEAL | 9/14/23 | 1719-1732 |
| 37 (SEALED) | EXHIBIT: VIDEO OF HEARING | 9/14/23 | N/A |

| 38 (SEALED) | OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION | 9/15/23 | Unavailable |
|---|---|---|---|
| 41 (SEALED) | REPLY TO RESPONSE TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION DEPOSITION EXCERPTS | 9/27/23 | Unavailable |
| 41-1 (SEALED) | EXHIBIT: AFFIDAVIT OF KC JOHNSON | 9/27/23 | Unavailable |
| 44 (SEALED) | DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION | 10/26/23 | Unavailable |
| 48 | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION | 5/2/24 | 1881-1893 |
| 49 | NOTICE OF APPEAL | 5/3/24 | 1894 |