Case No. 24-3388

---

**IN THE UNITED STATES COURT
OF APPEALS FOR THE SIXTH CIRCUIT**

---

**JOHN NOAKES,**

*Plaintiff-Appellant*,

v.

**THE UNIVERSITY OF CINCINNATI; ALECIA TRAMMER; ADRIENNE
LYLES; BLEUZETTE MARSHALL; ASHLEIGH WADE,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:23-cv-00284
The Honorable Michael R. Barrett, U.S. District Judge

---

**BRIEF OF DEFENDANTS-APPELLEES**

---

Dominick S. Gerace
Jada M. Colon
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
dgerace@taftlaw.com
jcolon@taftlaw.com

*Attorneys for Defendants-Appellees*

**DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST OF DEFENDANT-APPELLEE
UNIVERSITY OF CINCINNATI**

Defendant-Appellee University of Cincinnati is an arm of the State of Ohio.

Pursuant to Sixth Circuit Rule 26.1(a), University of Cincinnati is not required to file a statement of corporate affiliation.

*/s/ Dominick S. Gerace*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST OF DEFENDANTS-APPELLEES ALECIA TRAMMER, ADRIENNE LYLES, BLEUZETTE MARSHALL, AND ASHLEIGH WADE**

Pursuant to Sixth Circuit Rule 26.1(a), Defendants-Appellees Alecia Trammer, Adrienne Lyles, Bleuzette Marshall, and Ashleigh Wade make the following disclosures:

1. Are any parties a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   No.

*/s/ Dominick S. Gerace*

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL
INTEREST OF DEFENDANT-APPELLEE UNIVERSITY OF CINCINNATI … i

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL
INTEREST OF DEFENDANTS-APPELLEES ALECIA TRAMMER,
ADRIENNE LYLES, BLEUZETTE MARSHALL, AND ASHLEIGH WADE ... ii

TABLE OF CONTENTS …………………………………………………... iii

TABLE OF AUTHORITIES ………………………………………….. vi

STATEMENT OPPOSING ORAL ARGUMENT ……………………… x

STATEMENT OF JURISDICTION ………………………………………... 1

STATEMENT OF THE ISSUES …………………………………………… 3

STATEMENT OF THE CASE ………………………………………... 4

    A.    Factual Background …………………………………………… 4

    B.    Procedural History ………………………………………… 10

SUMMARY OF THE ARGUMENT ………………………………………… 11

ARGUMENT ……………………………………………………………… 13

    I.    This Court Reviews the District Court's Decision Denying a
Preliminary Injunction for Abuse of Discretion. ………………….. 13

    II.    The District Court Properly Found that Noakes Failed to Demonstrate
a Likelihood of Success on the Merits of his Procedural Due Process
Claim. …………………………………………………………… 15

        A.    Noakes was provided with sufficient notice of the charges
against him and a meaningful opportunity to prepare for the
hearing. …………………………………………………... 18

       i.     The formal Notice provided Noakes with sufficient notice of the charges against him. ………………… 19

       ii.    Additional information given to Noakes months prior to the hearing provided more than sufficient notice of the charges against him. ……………………………… 22

       iii.   This case is nothing like the cases cited by Noakes. … 26

B.    The hearing panel's decision did not rest on undisclosed or unreliable evidence. ………………………………… 28

C.    Noakes received a fundamentally fair process. ………….. 31

       i.     Noakes was not prejudiced by alleged delays. ………. 31

       ii.    Noakes was not entitled to information regarding Roe's supportive measures and medical records. …………... 34

           (1) Supportive measures. …………………………... 34

           (2) Medical records. ………………………………. 37

       iii.   The hearing panel's decision does not support an inference of bias. ……………………………….. 38

       iv.   Noakes failed to establish any errors, let alone cumulative errors, that would constitute a due process violation. …………………………………….... 41

           (1) Brett Sokolow. ……………………………… 42

           (2) Noakes's refusal to provide a statement. ………… 43

           (3) Title IX Policy timelines. …………………….. 44

       v.    Noakes fails to present any evidence that the panel members were biased. ………………………….... 46

D.    The District Court lacks personal jurisdiction under the common-law doctrine of sovereign immunity and subject matter jurisdiction under the Eleventh Amendment. ……….. 49

III.    Noakes Cannot Establish Irreparable Injury. ……………………… 52

IV.    A Preliminary Injunction Would Cause Substantial Harm to Others and Would Not Serve the Public Interest. …………………………. 54

V.    Noakes Should Not be Excused from Bond Requirements. ……….. 54

CONCLUSION ……………………………………………………………… 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abney v. Amgen, Inc.*,
443 F.3d 540 (6th Cir. 2006) .................................................................52

*Bd. of Curators of the Univ. of Mo. v. Horowitz*,
435 U.S. 78 (1978) .................................................................................16

*Castillo v. Whitmer*,
823 F. App'x 413 (6th Cir. 2020) ..........................................................15

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) .................................................................14

*D.T. v. Sumner Cnty. Sch.*,
942 F.3d 324 (6th Cir. 2019) .....................................................14, 52, 53

*Dana Corp. v. Celotex Asbestos Settlement Tr.*,
251 F.3d 1107 (6th Cir. 2001) ...............................................................14

*Dietchweiler v. Lucas*,
827 F.3d 622 (7th Cir. 2016) .................................................................27

*Doe v. Baum*,
903 F.3d 575 (6th Cir. 2018) ...........................................................16, 34

*Doe v. Bowling Green State Univ.*,
No. 3:22-cv-140, 2022 U.S. Dist. LEXIS 179939
(N.D. Ohio Sept. 30, 2022) ....................................................................46

*Doe v. Brandeis University*,
177 F. Supp. 3d 561 (D. Mass. 2016). ...............................................26, 27

*Doe v. Cummins*,
662 F. App'x 437 (6th Cir. 2016) ...................................................*passim*

*Doe v. Miami Univ.*,
882 F.3d 579 (6th Cir. 2018) ...........................................16, 17, 23, 29

*Doe v. Mich. State Univ.*,
989 F.3d 418 (6th Cir. 2021) .................................................................44

*Doe v. Oberlin Coll.*,
963 F.3d 580 (6th Cir. 2020) ....................................................................39

*Doe v. Ohio State Univ.*,
219 F. Supp. 3d 645 (S.D. Ohio 2016) ...............................................37, 49

*Doe v. Ohio State Univ.*,
311 F. Supp. 3d 881 (S.D. Ohio 2018) ...............................................35, 36

*Doe v. Purdue Univ.*,
928 F.3d 652 (7th Cir. 2019) ....................................................................39

*Doe v. Univ. of Cincinnati*,
173 F.Supp.3d 586 (S.D. Ohio 2016) ..................................................44, 47

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) ...........................................................*passim*

*Doe v. Univ. of Notre Dame*,
No. 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645
(N.D. Ind. May 8, 2017) ...........................................................................27

*Doster v. Kendall*,
596 F. Supp. 3d 995 (S.D. Ohio 2022) .....................................................14

*Duke v. N. Texas State Univ.*,
469 F.2d 829 (5th Cir. 1972), *cert. denied*, 412 U.S. 932 (1973) ...........46

*Dusenbery v. United States*,
534 U.S. 161 (2002) ..................................................................................15

*Erny v. Bd. of Trustees of Indiana Univ.*,
No. 1:22-cv-00524 (S.D. Ind. June 3, 2024)............................................40

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
679 F.2d 100 (6th Cir. 1982) ....................................................................14

*Gomes v. Univ. of Maine Sys.*,
365 F.Supp.2d 6 (D. Me. 2005) ................................................................48

*Ikpeazu v. Univ. of Neb.*,
775 F.2d 250 (8th Cir. 1985) ....................................................................46

*Ingraham v. Wright,*
430 U.S. 651 (1977) .................................................................16

*J. Endres v. Ne. Ohio Med. Univ.,*
938 F.3d 281 (6th Cir. 2019) .............................................16, 17, 29

*Martin-Marietta Corp. v. Bendix Corp.,*
690 F.2d 558 (6th Cir. 1982) .....................................................54

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ...........................................................20, 21

*McMillan v. Hunt,*
No. 91-3843, 1992 WL 168827 (6th Cir. July 21, 1992) ......................46

*McNeilly v. Land,*
684 F.3d 611 (6th Cir. 2012) .....................................................14

*Morrissey v. Brewer,*
408 U.S. 471 (1972) .................................................................16

*Nokes v. Miami University,*
No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880
(S.D. Ohio Aug. 25, 2017) ........................................................28

*Regents of the Univ. of Mich. v. Ewing,*
474 U.S. 214 (1985) .................................................................16

*Scottsdale Ins. Co. v. Flowers,*
513 F.3d 546 (6th Cir. 2008) .....................................................38

*Speech First, Inc. v. Schlissel,*
939 F.3d 756 (6th Cir. 2019) .....................................................15

*Stenberg v. Cheker Oil Co.,*
573 F.2d 921 (6th Cir. 1978) .....................................................13

*Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP,*
759 F.3d 522 (6th Cir. 2014) .....................................................38

*Top Flight Ent., Ltd. v. Schuette,*
729 F.3d 623 (6th Cir. 2013) .....................................................51

*Univ. of Cincinnati, Flaim v. Med. Coll. of Ohio*,
418 F.3d 629 (6th Cir. 2005) ...............................................................*passim*

*VanNahmen v. Dodge City Community College*,
No. 17-CV-1174, 2018 U.S. Dist. LEXIS 132451
(D. Kan. Aug. 7, 2018)......................................................................................26

*Welch v. Barham*,
635 F.2d 1322 (8th Cir. 1980) ........................................................................47

*Withrow v. Larkin*,
421 U.S. 35 (1975).......................................................................................46, 48

*Ex parte Young*,
209 U.S. 123 (1908)...........................................................................13, 49, 52

**Statutes**

18 U.S.C. § 1292 ................................................................................................2

34 C.F.R § 106.45 .....................................................................................*passim*

42 U.S.C. § 1983 ................................................................................................1

U.S. Const. amend. V.......................................................................................15

U.S. Const. amend. XI ...........................................................................1, 2, 13, 49

U.S. Const. amend. XIV ...........................................................................*passim*

**Rules**

Fed. R. App. P. 32...........................................................................................56

Fed. R. Civ. P. 26...........................................................................................31

Fed. R. Civ. P. 65...........................................................................................55

Fed. R. Evid. 602 ...........................................................................................31

Fed. R. Evid. 701 ...........................................................................................31

Fed. R. Evid. 702 ...........................................................................................31

## STATEMENT OPPOSING ORAL ARGUMENT

Oral argument will not be useful in this case. There are no complex or novel issues of law. A straightforward application of this Court's procedural due process precedent confirms that the District Court correctly determined that Plaintiff-Appellant failed to meet his burden of demonstrating a substantial likelihood of success on the merits and therefore is not entitled to preliminary injunctive relief. Nor does this case involve a contested or particularly extensive record. Given the District Court's thorough and well-reasoned opinion, this Court has ample ground to affirm without oral argument.

## STATEMENT OF JURISDICTION

Plaintiff-Appellant filed a Complaint on May 15, 2023, alleging violations of Title IX of the Education Amendments of 1972 (Count I), the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 (Count II), and Ohio law (Counts III and IV). (Verified Compl. and Jury Demand, R. 1, PageID #1-167). In conjunction with the Complaint, Plaintiff-Appellant filed a motion seeking preliminary injunctive relief based on Count II. (Mot. for Preliminary Injunction, R. 3, PageID #171-206).

On July 7, 2023, Defendants-Appellees filed a motion to dismiss. (Mot. to Dismiss, R. 17, PageID #302-345). With respect to Count II, Defendants-Appellees argued that the District Court lacks subject matter jurisdiction under the Eleventh Amendment to the United States Constitution and personal jurisdiction under the common-law doctrine of sovereign immunity. (*Id*. at PageID #320-324). In opposing Plaintiff-Appellant's motion for preliminary injunction, Defendants-Appellees made the same argument. (Opp. to Mot. for Preliminary Injunction ("PI Opp."), R. 38).

On May 2, 2024, the District Court entered an Order denying Plaintiff-Appellant's motion for a preliminary injunction. (Order, R. 48, PageID #1881-1893). Plaintiff-Appellant filed a timely Notice of Appeal on May 3, 2024. (Notice of Appeal, R. 49, PageID #1894).

Defendants-Appellees recognize this Court's jurisdiction to review the District Court's denial of Plaintiff-Appellant's motion for preliminary injunction under 18 U.S.C. § 1292(a)(1). However, for the reasons stated in Part D of Defendants-Appellees's argument below, Defendants-Appellees do not concede the issue of subject matter jurisdiction under the Eleventh Amendment and personal jurisdiction under the common-law doctrine of sovereign immunity. Defendants-Appellees's motion to dismiss on those grounds remains pending in the District Court.

## STATEMENT OF THE ISSUES

Whether the District Court abused its discretion in denying Plaintiff-Appellant's motion for a preliminary injunction when it concluded that Plaintiff-Appellant failed to establish a substantial likelihood of success on the merits of his procedural due process claim on grounds that Plaintiff-Appellant received adequate notice of the charges against him and a meaningful opportunity to be heard during disciplinary proceedings conducted at the University of Cincinnati.

## STATEMENT OF THE CASE

### A. Factual Background

Plaintiff-Appellant John Noakes ("Noakes"), a former University of Cincinnati ("UC") student, was expelled in May 2023 after a hearing panel found that he violated UC's Title IX Sexual Harassment Policy. (Compl., R. 1 at ¶¶ 4, 108, PageID #3, #44). The proceedings against Noakes resulted from an incident involving Noakes and another UC student, Jane Roe.

On September 10, 2021, Noakes and Roe engaged in sexual activity after meeting at a party hosted by Noakes's fraternity. (*Id*. at ¶ 54, PageID #21). The next day, Roe spoke with a fraternity leader about the incident, alleged that the sexual activity was non-consensual, and provided the fraternity leader with documentation in support of her allegation, including a statement describing what she had experienced. (*Id*. at ¶ 57, PageID #22; Deposition of John Noakes ("Noakes Dep."), R. 32-2, PageID #1488-1500).

On September 12, 2021, approximately two days after the incident, Noakes learned that Roe had alleged that he sexually assaulted her. (Noakes Dep., R. 32 at 26:24-25, 27:1-3, 27:7-9, PageID #1397). That day, Noakes was contacted by a member of his fraternity informing him that a judiciary board ("J-Board") meeting was going to be held to discuss the matter. (*Id*. at 27:10-17, PageID #1397). Despite being aware that Roe had accused him of sexual assault, Noakes took no steps to

preserve evidence. (*Id*. at 51:23-25, 52:1-8, PageID #1403). On September 13, 2021, the fraternity held a J-Board meeting during which Noakes was required to give an extensive statement. (*Id*. at 32:18-25, 33:1-9, PageID #1398). Following the J-Board meeting, the fraternity decided to remove Noakes, but later reinstated him. (*Id*. at 52:21-23, 70:12-14, PageID #1403, 1408).

On March 30, 2022, UC's Office of Gender Equity & Inclusion ("OGEI") received an online report from the Assistant Director of Fraternity and Sorority Life. (PI Opp., R. 38-1 at ¶ 4). The report indicated that Roe had alleged that Noakes sexually assaulted her during the party on September 10, 2021. (*Id*. at ¶ 4; Deposition of Bleuzette Marshall ("Marshall Dep."), R. 30-5, PageID #1108-1110). OGEI reached out to Roe the following day, and later met with Roe on April 6, 2022. (PI Opp., R. 38-1 at ¶¶ 5, 6).

On July 26, 2022, Roe submitted a Formal Complaint to OGEI containing the sexual assault allegation against Noakes. (*Id*. at ¶ 7; Marshall Dep., R. 30-5, PageID #1114-17). In the Formal Complaint, Roe stated that she had been drinking on the night of the incident, that she believed that she had been drugged by someone at the party, and that she did not consent to sex with Noakes. (Marshall Dep., R. 30-5, PageID #1114-17).

On July 28, 2022, OGEI Investigator Morgan Shaw ("Shaw") met with Roe to discuss the Formal Complaint. (PI Opp., R. 38-1 at ¶ 8).

On August 18, 2022, Shaw provided Noakes with a Notice of Commencement of OGEI Investigation ("Notice"). (*Id.* at ¶ 9). The Notice informed Noakes that "[t]he Formal Complaint alleges that on September 10, 2021, at approximately 11:49pm, at 2707 Clifton Ave. … [Noakes] engaged in vaginal intercourse with [Roe] without [Roe's] consent." (*Id.* at ¶ 10; Marshall Dep., R. 30-5, PageID #1121-23).

On September 12, 2022, Noakes obtained, from a member of his fraternity, the documents that Roe had provided to the fraternity in September 2021. (PI Opp., R. 38-2). These documents included the statement from Roe wherein Roe claimed that she was incapacitated and did not consent to the sexual encounter. (Noakes Dep., R. 32-2, PageID #1488-1500).

Thereafter, Shaw conducted an investigation that included interviews of Roe, Noakes, and nine witnesses. (PI Opp., R. 38-1 at ¶ 11). All of the witness statements provided to Shaw were included in a Preliminary Investigative Report ("PIR") and a Final Investigative Report ("FIR") prepared by Shaw, including Roe's interview statements and Noakes's interview statement. (Marshall Dep., R. 30-5, PageID #1078-88). Per the interview statements contained in the PIR and the FIR, Roe told Shaw that she had been drinking before and during the fraternity party and that she had only flashes of memory regarding the sexual encounter with Noakes. (*Id.*). On September 20, 2022, Shaw interviewed Noakes, who stated he did not feel

comfortable providing a statement. (*Id*. at PageID #1088). However, Noakes told Shaw that the sexual encounter with Roe "was consensual, and she was not incapacitated." (*Id*.).

During the course of the investigation, Shaw sent several emails to Noakes informing him that the investigation was ongoing. (PI Opp., R. 38-1 at ¶ 12.). On November 4, 2022, Shaw informed Noakes that additional evidence had been provided to her and, accordingly, that "good cause exists for the investigator to extend the timeframe for the investigatory process." (*Id*. at ¶ 14).

On November 10, 2022, Shaw provided Noakes with the PIR, to which Noakes submitted a written response denying the allegations. (*Id*. at ¶ 15). On December 6, 2022, Shaw provided Noakes with the FIR, over two months before the eventual disciplinary hearing. (Noakes Dep., R. 32-4, PageID #1505-07). On December 9, 2022, Noakes was informed that the matter had been referred for a hearing. (PI Opp., R. 38-3 at ¶ 3).

On December 28, 2022, Noakes requested that his disciplinary hearing, which had been scheduled to take place in January 2023, be moved to a date in February 2023 to accommodate a change in his advisor to Scott O'Reilly ("O'Reilly"), and to provide O'Reilly additional time to prepare. (Deposition of Scott O'Reilly ("O'Reilly Dep."), R. 33-4, PageID #1669-70). UC honored Noakes's request. (*Id*.)

Noakes appeared at a hearing on February 20, 2023. (PI Opp., R. 38-3 at ¶¶ 4, 5). The hearing panel consisted of employees from TNG Consulting. (*Id*. at ¶ 5). The hearing panel received and reviewed the FIR. (*Id*. at ¶ 6). In addition, during the hearing, Noakes testified, presented opening and closing statements, and cross-examined Roe and other witnesses. (PI Opp., R. 38-3 at ¶¶ 7, 8; Noakes Dep., R. 32 at 19:8-21, PageID #1395; O'Reilly Dep., R. 33 at 90:10-20, PageID #1566; Hearing recording ("Hearing rec."), R. 37 at 1:31:51, 2:09:10, 7:43:00).

During the hearing, the panel asked Noakes about his claim that he did not feel comfortable providing a statement to Shaw without more information. Noakes acknowledged under questioning that, at the time of the interview with Shaw, he knew that Roe had alleged non-consensual sex as a result of incapacitation:

**Roe's Advisor:**   And is there a reason you chose to say that [Roe] was not incapacitated?

**Noakes:**   Yes. All of—everything that led up to the sexual interaction showed to me that it was not like that.

**Roe's Advisor:**   Ok. Fair enough. Poor questions. Is there a reason that you chose to use that phrase if you didn't feel comfortable providing a statement without knowing more about the allegations why you chose to say that she was not incapacitated. Like why you chose that phrase.

**Noakes:**   Cause that was the allegation. *The allegation was that it was not consensual and that she was incapacitated*.

**Roe's Advisor:**   Ok so you knew enough about the allegation when you issued that statement or with the help of your advisor that this was about consensual sex. Is that right?

8

**Noakes:** Yes.

(Hearing rec., R. 37 at 3:43:51).

On March 23, 2023, Noakes was notified that the hearing panel found him responsible for violating UC's Title IX Sexual Harassment Policy and determined that Noakes should be expelled from UC. (PI Opp., R. 38-3 at ¶ 9; Deposition of Joseph Vincent ("Vincent Dep."), R. 29-2, PageID #588-601). In its Outcome Letter, the hearing panel made extensive credibility findings with regard to both Roe and Noakes. (Vincent Dep., R. 29-2, PageID #596-600). Though the hearing panel concluded that it "did not find sufficient evidence that anyone was 'drugged,'" the panel determined that Roe's "description of her state of intoxication was ultimately determined to be credible" because Roe's description was "corroborated by other witnesses … and was materially consistent over the multiple statements made by [Roe] in the course of the grievance process." (*Id*. at PageID #596).

With respect to Noakes, the hearing panel found that "[Noakes's] description of [Roe's] behavior ultimately lacked credibility because it did not make sense when compared to other parts of [Noakes's] testimony" and that "[o]verall, [Noakes's] description of [Roe's] condition during the sexual interaction was incomplete and contradictory at times, leading the panel to conclude that [Noakes's] memory and/or stated recollection was unreliable at best, and deceptive at worst." (*Id*. at PageID #597, 600).

9

On March 30, 2023, Noakes appealed the hearing panel's decision. (PI Opp.,
R. 38-3 at ¶ 10). The appeals panel consisted of individuals from INCompliance
Consulting. (*Id*. at ¶ 11). On May 5, 2023, the appeals panel denied Noakes's appeal.
(*Id*. at ¶ 12).

Noakes is no longer a student at UC and has no desire to return to UC. (Noakes
Dep., R. 32 at 62:14-18, PageID #1406). Instead, Noakes enrolled at another
university and planned to graduate in the Spring of 2024. (*Id*.). Following
graduation, Noakes secured a full-time job. (*Id*. at 63:7-14, PageID #1406).

## B. Procedural History

On May 15, 2023, Noakes filed a Complaint against UC and Defendants-
Appellees Alecia Trammer, Adrienne Lyles, Bleuzette Marshall, and Ashleigh Wade
(together the "Individual Defendants"). (Verified Compl. and Jury Demand, R. 1,
PageID #1-167). In Count I, Noakes alleges that he is entitled to monetary damages
from UC for violations of Title IX based on an "erroneous outcome" theory. (*Id*. at
¶¶ 119-128, PageID #54-58). In Count II, Noakes seeks declaratory and injunctive
relief against the Individual Defendants in their official capacities for violations of
his due process rights. (*Id*. at ¶¶ 129-139, PageID #58-61). In Counts III and IV,

Noakes sought declaratory judgment for alleged violations of Ohio state law. (*Id*. at ¶¶140-162, PageID #61-64).[1]

In conjunction with filing the Complaint, Noakes filed a motion seeking a temporary restraining order and preliminary injunction against the Individual Defendants based on Count II only—his procedural due process claim. (Mot. for Preliminary Injunction, R. 3, PageID #171-228).[2] On May 2, 2024, after the parties conducted limited discovery and after hearing oral argument, the District Court entered an order denying Noakes's motion for a preliminary injunction. (Order, R. 48, PageID #1881-1893).

## SUMMARY OF THE ARGUMENT

The law requires that Noakes and similarly-situated students receive a fundamentally fair disciplinary process featuring adequate notice of the charges against them and a meaningful opportunity to be heard. As the District Court correctly concluded, Noakes received such due process here. And while Noakes invites the Court to consider this case analogous to a host of other cases where the

---

[1] On September 21, 2023, Noakes voluntarily dismissed the Ohio state law claims in response to Defendants-Appellees's motion to dismiss. (Notice of Dismissal of Counts III and IV, R. 39, PageID #1795).

[2] Noakes's motion for temporary restraining order and preliminary injunction also invoked the Ohio state law claims that he later dismissed, and Noakes eventually withdrew his request for a temporary restraining order.

Court has found due process violations in the context of student disciplinary proceedings, this is not one of those cases.

Noakes received formal notice of the allegations against him three weeks after Roe filed her formal complaint. That notice informed Noakes of the date, time, and location of the incident as well as the accusations made against him. After the investigatory process commenced, the investigator invited Noakes to participate in the process and kept Noakes apprised of the progress of the investigation. Then, months before the hearing, the investigator provided Noakes with both a preliminary investigative report and a final investigative report containing all of the witness statements and information gathered, including Roe's detailed statement of her account of the evening.

Throughout the investigation, adjudication, and appeal, Noakes had access to and used his advisor. UC even agreed to delay the hearing to allow Noakes's advisor more time to prepare. During the hearing—held before a neutral three-member panel—Noakes made opening and closing statements, testified in his own defense, and cross-examined witnesses, including Roe. The hearing panel's decision finding Noakes responsible for violating UC policy was well-reasoned, weighed the evidence presented, and analyzed the credibility of all witnesses, including Roe and Noakes. Following the hearing panel's decision, Noakes was permitted to appeal to a separate neutral three-member panel. On this record, the District Court correctly

determined that Noakes failed to carry his burden of establishing that he has a substantial likelihood of success on the merits of his procedural due process claim.

Noakes also cannot show a likelihood of success on the merits because his procedural due process claim is barred by the common law doctrine of sovereign immunity and the Eleventh Amendment. Noakes asserts the due process claim against the Individual Defendants in their official capacities as UC employees. But the claim does not satisfy the *Ex parte Young* exception because Noakes cannot prove an ongoing violation of federal law and seeks only retrospective relief for past conduct, and because Noakes has not demonstrated that the Individual Defendants are responsible for the alleged conduct or can deliver the relief requested.

Finally, even if Noakes could establish a likelihood of success on the merits of his procedural due process claim, the other preliminary injunction factors weigh against him. Noakes cannot show irreparable injury because he complains of harm that is speculative and unsubstantiated, and the injunctive relief requested by Noakes will harm UC's ability to administer its disciplinary process and harm third-parties affected by Noakes's conduct.

## ARGUMENT

### I. This Court Reviews the District Court's Decision Denying a Preliminary Injunction for Abuse of Discretion.

A preliminary injunction is an extraordinary remedy used to preserve the court's ability to render a meaningful decision after a trial on the merits. *Stenberg v.*

*Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). To obtain a preliminary injunction, a movant must first show that there is no adequate remedy at law for the alleged injury. *Dana Corp. v. Celotex Asbestos Settlement Tr.*, 251 F.3d 1107, 1118 (6th Cir. 2001). In evaluating a request for a preliminary injunction, a district court considers: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

No one of these four factors is dispositive; rather, the court should balance each of the factors. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). However, even the strongest showing of the other three factors cannot eliminate the irreparable injury requirement. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). "That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019). The party seeking the preliminary injunction bears the burden of justifying such relief. *Doster v. Kendall*, 596 F. Supp. 3d 995, 1014 (S.D. Ohio 2022).

This Court reviews a district court's decision denying a preliminary injunction for an abuse of discretion. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). This standard of review is "highly deferential" to the district court. *Id.* A district court's decision on a preliminary injunction will only be disturbed if it "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Castillo v. Whitmer*, 823 F. App'x 413, 415 (6th Cir. 2020). In applying this deferential standard, the Court reviews the district court's determination of the likelihood of success on the merits de novo. *Schlissel*, 939 F.3d at 763.

## II. The District Court Properly Found that Noakes Failed to Demonstrate a Likelihood of Success on the Merits of his Procedural Due Process Claim.

Noakes bases his request for a preliminary injunction on his claim that the Individual Defendants deprived him "of life, liberty, or property, without due process of law" in violation of the Fourteenth Amendment to the U.S. Constitution. (Compl., R. 1 at ¶ 131, PageID #58).[3] To establish a violation of his procedural due process rights, Noakes must show that: (1) he had a property or liberty interest of which he was deprived; and (2) the state did not afford him adequate procedural

---

[3] Noakes also invoked the Fifth Amendment in Count II. The District Court properly limited its analysis to the Fourteenth Amendment's Due Process Clause because the Fifth Amendment applies only to the United States government and its officials. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002).

rights prior to depriving him of the interest. *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).

Where a party properly alleges the existence of a property or liberty interest,[4] "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). This Court has explained clearly the parameters of adequate procedural rights for students facing disciplinary action:

> At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" While the exact outlines of process may vary, universities must "at least" provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker. … Review under *Mathews* asks only whether John Doe "had an opportunity to 'respond, explain, and defend,'" not whether a jury could constitutionally convict him using the same procedures.

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-400 (6th Cir. 2017) (internal citations omitted).

Although Noakes suggests that cases like *Univ. of Cincinnati*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005), *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018), *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), and *J. Endres v. Ne. Ohio*

---

[4] While recognizing this Court's precedent on the matter, Defendants-Appellees do not concede that Noakes has a protected property or liberty interest in continuing his education at UC, or otherwise. *See Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 222 (1985); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (1978).

*Med. Univ.*, 938 F.3d 281 (6th Cir. 2019), impose a due process standard beyond "mere notice and opportunity to be heard," these cases do no such thing. Instead, they simply recognize that the determination of whether those two due process requirements have been met must be judged "based on the context in which the dispute arose." *Flaim*, 418 F.3d at 634.

In evaluating the context of each case, this Court has consistently recognized that the law aims to achieve an appropriate "middle ground." *Id*. at n.1. While cases involving disciplinary expulsion may require a "more searching inquiry" than cases involving academic expulsion, *id*. at 634, disciplinary cases do not require "the same procedural safeguards as [accorded to] a criminal defendant." *Endres*, 938 F.3d at 297. This is so even where the charge against the student involves allegations of sexual assault. *Miami Univ.*, 882 F.3d at 600.

When examined against these principles, the record is clear that Noakes failed to meet his burden of establishing a substantial likelihood of success on the merits of his procedural due process claim. The District Court correctly concluded that Noakes received a fundamentally fair process in the context of this dispute: "He was provided with notice that was both adequate and timely, he had access to an advisor, he was able to present a defense and meaningfully cross-examine witnesses before an unbiased panel, and he was permitted to appeal an unfavorable outcome." (Order,

17

R. 48, PageID #1893). Noakes's arguments to the contrary strain credibility and seek to impose heightened procedural requirements akin to a criminal trial.

## A. Noakes was provided with sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing.

The District Court correctly held that Noakes received sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing. (Order, R. 48, PageID #1888).

Notice satisfies due process where the student has "sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638. UC fulfilled this due process requirement—both in the formal Notice provided by Shaw and by providing significant information to Noakes months in advance of the disciplinary hearing. And while Noakes concocts an argument that he failed to receive sufficient notice because he was not informed that "Roe was alleging that she was incapacitated *due to alcohol consumption*," (Appellant Br., Doc. 15, PageID #33) (emphasis added), this false dichotomy between drugs and alcohol finds no basis in the record and carries no legal or factual significance with respect to whether Noakes was provided constitutionally adequate notice—he was.

### i.    The formal Notice provided Noakes with sufficient notice of the charges against him.

On August 18, 2022, Shaw sent Noakes a formal Notice that outlined the following: "The Formal Complaint alleges that on September 10, 2021 at approximately 11:49 pm, at 2707 Clifton Ave. … Respondent [John Noakes] engaged in vaginal intercourse with [Roe] without [Roe's] consent." (PI Opp., R. 38-1 at ¶ 10; Marshall Dep., R. 30-5, PageID #1121-23). The Notice also provided that the conduct alleged was determined to fall within the scope of UC's Title IX Sexual Harassment Policy regarding Sexual Assault. (Marshall Dep., R. 30-5, PageID #1121-23).

Noakes suggests that the Notice was "insufficient under *Flaim*" because it did not specify that Roe was incapacitated "due to alcohol consumption" with "sufficient time to prepare a response before any initial interview." (Appellant Br., Doc. 15, PageID #33, 36). But due process does not require that level of specificity, nor does it require that notice be provided prior to an interview. Rather, the inquiry regarding adequate notice is concerned with whether the student received sufficient notice of the charges such that the student had a meaningful opportunity to prepare for *the hearing*. *Flaim*, 418 F.3d at 638; *Doe v. Cummins*, 662 F. App'x 437, 447 (6th Cir. 2016).

Here, the formal Notice gave Noakes information sufficient to prepare for the hearing and provided Noakes with notice that Roe was alleging non-consensual sex

due to incapacitation. The Notice states that Roe did not provide "consent" to engage in vaginal intercourse and references UC's Title IX Sexual Harassment Policy. (PI Opp., R. 38-1 at ¶ 10; Marshall Dep., R. 30-5, PageID #1121-23). That Policy, which Noakes's advisor was familiar with and had reviewed prior to the hearing (O'Reilly Dep., R. 33 at 77:21-25, 78:1-25, 79:1-7, PageID #1562-63), defines the term "consent." The Policy provides that "[a] person cannot give consent if the person is mentally or physically incapacitated." The policy then defines "incapacitation" to include "physical or mental impairment resulting from drugs or alcohol." (Compl., R. 1-3 at PageID #104). Accordingly, the Notice clearly contemplated that the allegations against Noakes involved lack of consent due to incapacitation.[5]

Noakes invokes the factors under *Mathews v. Eldridge*, 424 U.S. 319, 347 (1976), arguing that UC easily could have provided more information in the Notice, but chose not to despite the minimal additional costs associated with doing so. (Appellate Br., Doc. 15, PageID #36). But Noakes's argument overlooks the significant potential costs of providing extensive detailed information at the early stages of a disciplinary proceeding. As explained by Dr. Marshall:

---

[5] The record also indicates that Noakes knew that Roe was alleging incapacitation *prior to* receiving the Notice. Two days following the incident, Noakes was told by his fraternity that Roe had alleged sexual assault. (Noakes Dep., R. 32 at 26:24-25, 27:1-3, 27:7-9, PageID #1397). And Noakes testified during the disciplinary hearing that he did not "lack any clarity to be able to respond to" Roe's accusation when he went before the fraternity J-Board (Hearing Rec., R. 37 at 3:54:25).

As the Complainant is sharing information the intended audience is not that of the Respondent. Based off of our Formal Complaint form that is an internal document that we use to make an assessment and then to craft whatever the Notice letter will be. Other information is that, one, it hasn't been investigated. Two, it limits or it could limit the Respondent from just sharing information and a response may be tailored just to fit whatever has been written. Three, other individuals could be written in the Formal Complaint and that information technically would be confidential. And then I will just stop with 4 that that could potentially lead to retaliation or retaliatory behavior.

(Marshall Dep., R. 30 at 38:6-25, 39:1-14, PageID #989). Dr. Marshall's testimony appropriately identifies the significant government interest in protecting witnesses and maintaining the integrity of the investigatory process. Those interests must be accounted for under *Mathews*, and the Notice here appropriately balances those interests while ensuring that Noakes received information sufficient to place him on notice of Roe's allegations.[6]

---

[6] Contrary to Noakes's suggestion, the Notice also clearly complied with Title IX requirements, lending further support to the argument that the Notice satisfied due process and appropriately balanced the government's interests with Noakes's interests. Title 34, Code of Federal Regulations, § 106.45(b)(2), requires the notice to include "sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment under § 106.30, and the date and location of the alleged incident, if known." Here, the Notice stated that Roe (identity of the party involved) had alleged that, on September 10, 2021, at approximately 11:49 pm, at 2707 Clifton Ave. (date and location), Noakes engaged in vaginal intercourse with Roe without her consent (the conduct allegedly constituting sexual harassment).

21

### ii.    Additional information given to Noakes months prior to the hearing provided more than sufficient notice of the charges against him.

In addition to the formal Notice, Noakes received additional and significant information from UC several months prior to the disciplinary hearing that provided additional and detailed notice of Roe's allegations. (Noakes Dep., R. 32-2, PageID #1488-1500). Indeed, Noakes made statements to Shaw and to the hearing panel acknowledging that he understood exactly what Roe was alleging months before his hearing.

During his interview with Shaw on September 22, 2022—approximately five months prior to the hearing and a month after Noakes received the formal Notice—Noakes specifically stated that Roe "was not incapacitated." (Marshall Dep., R. 30-5, PageID #1088). Noakes would not have used the term "incapacitated" during the interview had he not been placed on notice that Roe's allegations involved incapacitation. Subsequently, during the disciplinary hearing itself, Noakes confirmed that, at the time of his interview with Shaw, he understood that Roe was alleging incapacitation. When asked during the disciplinary hearing why he used the term "incapacitated" when he spoke to Shaw, Noakes responded: "that was the allegation." (Hearing Rec., R. 37 at 3:44:45).

In November 2022, Shaw provided Noakes with the PIR. (PI Opp., R. 38-1 at ¶ 15). Thereafter, on December 6, 2022—over two months prior to the disciplinary

proceeding—Noakes received the FIR. Both documents included a summary of Shaw's interviews of Roe that took place in August 2022 and September 2022. (Marshall Dep., R. 30-5, PageID #1078-88; O'Reilly Dep., R. 33 at 54:12-17, PageID #1557; Noakes Dep., R. 32 at 55:20-23, PageID #1404). In those interviews, Roe admitted to alcohol consumption before and during the fraternity event and alleged that she thought she had been drugged while at the event. (Marshall Dep., Doc. 30-5, PageID #1078-88). This information was more than sufficient to allow Noakes to prepare for, and defend himself at, the hearing. *Cf. Miami Univ.*, 882 F.3d at 603 (notice adequate where plaintiff had notice two days after the incident occurred and the University explained the allegations against him in an in-person meeting eight days later).

Noakes claims that he did not receive adequate notice because he was unaware that the hearing panel might consider alcohol consumption as contributing to Roe's alleged incapacitation. Noakes suggests that he faced a "moving target" because the panel followed a different "theory" of incapacitation than that alleged by Roe. (Appellant Br., Doc. 15, PageID #33, 36). This argument holds no water.

First, Noakes was not entitled to notice of exactly what the panel might conclude after considering all of the evidence, hearing from witnesses, and judging credibility. Instead, Noakes was entitled to notice adequate to defend himself from the charges against him, and he unquestionably received that in the Notice, PIR, and

FIR. Whether Roe's allegation of drugging made her a less credible witness on the issue of her incapacitation (a matter that the panel squarely addressed in its Outcome Letter, as discussed below), is irrelevant to whether Noakes received adequate notice prior to the hearing—he did.

Second, the false dichotomy that Noakes constructs between alcohol incapacitation and drug incapacitation carries no real significance when it comes to whether Noakes was afforded notice adequate to allow him to prepare a defense. Noakes knew that Roe had alleged lack of consent due to incapacitation months before the hearing. Incapacitation is incapacitation, regardless of whether it occurs as a result of drugs or alcohol. Noakes's advisor acknowledged as much during his deposition. (O'Reilly Dep., R. 33 at 128:21-25, PageID #1575) ("Q: The question was does it provide notice that incapacitation is an issue that is being alleged, regardless if it's between drugs and alcohol? A: Yes."). And Noakes's defense—that Roe was not incapacitated—was the same regardless of the manner in which Roe may have become incapacitated.

Third, the record is clear that Noakes received substantial notice prior to the hearing that Roe had engaged in alcohol consumption on the evening of the party and, accordingly, was on notice that Roe's alcohol consumption would be an issue at the hearing. For example, Roe stated in her August 30, 2022 interview (provided to Noakes in the PIR and FIR):

- She started drinking around 8:50 p.m., about two and a half hours after having 2-3 slices of pizza.

- She had one glass of wine before attending the party, a red solo cup "filled with wine about halfway," and another six to seven glasses of wine in a smaller wine glass that she consistently spilled bumping into people and dancing.

- On a typical night out, she would typically only consume five drinks of alcohol.

(Marshall Dep., R. 30-5, PageID #1080-81).

Noakes also received, in the PIR and FIR, reports of other witness interviews conducted by Shaw, during which witnesses stated: "you could tell [Roe] was intoxicated" and "[i]t was like she couldn't do anything on her own"; Roe fell over band equipment; Roe needed help walking; and Roe fell over the band speakers, "something she never does. She seemed very intoxicated." (Marshall Dep., R. 30-5, PageID #1089, 1091, 1094, 1096, 1100).

Noakes asks the Court to ignore this clear notice of Roe's alcohol consumption for purposes of the due process inquiry on the basis that Roe herself believed she was not drunk and instead alleged she had been drugged. But the FIR— again, which Noakes received months prior to the hearing—was replete with information suggesting that Roe may have been intoxicated due to alcohol, and the hearing panel was entitled to consider all of the evidence of incapacitation placed before it—not just Roe's opinion of how she became incapacitated. On this record,

Noakes cannot credibly claim that he faced a "moving target" regarding the theory of the case.[7]

### iii.  This case is nothing like the cases cited by Noakes.

Noakes cites several cases in support of his argument that he received insufficient notice. None supports his position. In *VanNahmen v. Dodge City Community College*, No. 17-CV-1174, 2018 U.S. Dist. LEXIS 132451, at *10-11 (D. Kan. Aug. 7, 2018), the court held that the university failed to provide sufficient notice where a letter to the plaintiff only stated that he violated the school's code of conduct without providing any context other than that the violation allegedly occurred on or about two dates. This case could not be more factually distinguishable given the notice and amount of information that Noakes received months prior to the hearing.

In *Doe v. Brandeis University*, the court held that notice that a student engaged in "numerous inappropriate, nonconsensual sexual interactions" over a nearly two-year period was "vague and open-ended." 177 F. Supp. 3d 561, 603 (D. Mass. 2016). The court stated, "[u]nder the circumstances, the lack of specific notice of the charges may have been particularly prejudicial. *This was not a dispute about a single*

---

[7] In this regard, the Court must reject Noakes's claim that he somehow was prevented from conducting further investigation or procuring other witnesses due to lack of notice of alcohol consumption. The information received by Noakes was more than adequate to allow Noakes and his advisor to conduct an investigation and procure witnesses.

*isolated event*; it involved a lengthy and apparently tangled relationship that went on for nearly two years." *Id*. (emphasis added). The same is not true here. Noakes and Roe had one sexual encounter. (Noakes Dep., R. 32 at 26:20-23, PageID #1397). And Noakes was provided notice of the exact day, time, and allegation against him.

Noakes fares no better with *Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017), which was later vacated. There, the court held that the university failed to provide sufficient notice where a letter to the plaintiff merely provided that he violated the school's sexual assault policy. *Id*. at *29. The court also noted that the plaintiff received a 350-page report ten days prior to the hearing—insufficient time to prepare given the report's volume. *Id*. Here Noakes was provided with the FIR months before the hearing, and UC agreed to delay the hearing at his request to allow his substitute advisor to prepare.

Noakes then argues that this case fits into a category of cases about which the court "warned" in *Dietchweiler v. Lucas*, 827 F.3d 622, 630 (7th Cir. 2016). Not so. There, the Seventh Circuit expressed concern with respect to circumstances where the variance between the notice provided to the student and the substance of the hearing hampered the ability of the student to present a defense. No such variance occurred here. Noakes had sufficient notice that Roe had alleged incapacitation and knew that Roe's alcohol use would be at issue during the hearing.

27

Finally, Noakes points to *Nokes v. Miami University*, No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880, at *36 (S.D. Ohio Aug. 25, 2017), as somehow analogous to this case. It is not. There, this Court held that Miami University failed to provide the plaintiff with adequate notice to prepare for the hearing because the notice used limiting language, identifying only allegations of use of force and a new theory of incapacitation due to alcohol was presented to the plaintiff one week before the hearing. *Id*. Those facts are not present here, as the Notice, the FIR, and the PIR, were not so limiting. The Notice stated that Noakes engaged in vaginal intercourse with Roe without her consent. (Marshall Dep., R. 30-5, PageID #1121-23). And months before the disciplinary hearing, Noakes was provided with the PIR and FIR, which contained the specifics of Roe's allegations and significant information related to her use of alcohol.

### B. The hearing panel's decision did not rest on undisclosed or unreliable evidence.

Next, Noakes argues that a due process violation occurred because the hearing panel referenced a website regarding blood alcohol content (BAC) that was not disclosed prior to the hearing. But the District Court correctly concluded that the hearing panel's reference to the BAC calculator did not deprive Noakes of due process because the panel merely used the calculator as an "educational tool" and not as evidence, and because the hearing panel did not base its conclusions on the calculator. (Order, R. 48, PageID #1890).

In support of his argument, Noakes relies on *Miami Univ.* and *Endres*. But neither case demonstrates that the District Court erred. In *Miami Univ.*, the university withheld the entire investigative report and the evidence contained therein. 882 F.3d at 603. In *Endres*, this Court held that the university failed to provide a statistical analysis containing "incontrovertible proof" that the student had cheated and a memorandum drafted by the investigator containing witness statements from interviews with the student's physicians. 938 F.3d at 301-02.

Here, the panel withheld no evidence from Noakes—let alone such key and substantial evidence. Indeed, Noakes misinterprets the District Court's decision regarding the BAC calculator. Noakes argues that the District Court "excused the failure to disclose this evidence" by suggesting that the decision would have been the same regardless of whether the calculator was considered. (Appellant Br., Doc. 15, PageID #44). This is wrong. Instead, the District Court correctly concluded that the BAC calculator was not used as evidence by the hearing panel at all, but instead as an "educational tool." (Opinion, R. 48, PageID #1890). And unlike *Miami Univ.* and *Endres*, both of which involved a motion to dismiss and the limited determination that the plaintiffs had alleged enough facts to state a claim, the District Court here examined record evidence developed during discovery and made its conclusion based on that evidence.

A review of the record supports the District Court's conclusion. The hearing panel made clear in its decision that the blood alcohol website was used as an "educational tool," which simply provided that intoxication manifests in nausea, slow reflexes, staggering and slurring of words, reduced mental capacity, and loss of memory or consciousness. (Vincent Dep., R. 29 at 119:125, 120:1-11, PageID #525). The panel even recognized the limitations of the tool and BAC calculations in the Outcome Letter. (Vincent Dep., R. 29-2, PageID #595) ("Calculating an individual's blood alcohol content (BAC) is an imprecise exercise").

The chair of the hearing panel's deposition testimony, moreover, is consistent with the panel's written decision. The chair testified that the panel's decision would have remained the same in the absence of the blood alcohol calculation, (Vincent Dep., R 29 at 120:12-14, PageID #525), and that the panel did not treat the blood alcohol calculator as evidence. (*Id*. at 109:4, PageID #523) ("It wasn't treated as evidence."). Further, an objective reading of the Outcome Letter shows that the panel's conclusion regarding Roe's incapacitation was the product of witness testimony on that issue (as well as the incredibility of Noakes's own testimony). (Vincent Dep., R. 29-2, PageID #588-601).

Noakes relies on an affidavit from his purported expert witness, Harry Plotnick, wherein Plotnick opines that the information on the website is not accurate or reliable and that the conclusion by the panel about the likely level of intoxication

30

of Roe was not based on sufficient facts or data.[8] But Plotnick's opinion addresses the BAC calculator only and does not apply to, or account for, the testimony of the witnesses at the hearing—i.e., the evidence upon which the hearing panel actually relied to arrive at its conclusion regarding Roe's incapacity.

### C. Noakes received a fundamentally fair process.

The District Court correctly held that Noakes was given adequate and timely notice and the opportunity to be heard at a meaningful time and in a meaningful manner. (Order, R. 48, PageID #1893). These are the hallmarks of fundamental fairness under the Due Process Clause, and Noakes received a fundamentally fair process here. None of his remaining arguments to the contrary has merit.

### i. Noakes was not prejudiced by alleged delays.

Noakes argues that UC unduly delayed the investigation and adjudication of the matter because "UC was aware of the allegations in March, but Noakes was not informed about the allegations until over four months later in August." (Appellant Br., Doc. 15, PageID #48). Noakes also argues that UC caused delay by waiting three weeks to send notice after the Formal Complaint was filed. (*Id.* at PageID #49).

---

[8] Defendants-Appellees challenged this affidavit below, arguing that Plotnick's affidavit and opinion should be treated as that of a lay witness and as inadmissible under Fed. R. Evid. 602 and 701, that Noakes did not comply with Fed. R. Civ. P. 26(a)(2) regarding the disclosure of expert witnesses, and that the opinion fails to comply with Fed. R. Evid. 702's requirement of reliability and helpfulness.

As indicated above, a university is obligated to provide a student "notice of the charges." Notice satisfies due process where the student has "sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing." *Flaim*, 418 F.3d at 638. When courts analyze whether notice is sufficient for due process purposes, they consider the amount of time the student had to prepare for the hearing—not how long the university took to notify the student following the filing of a complaint. *Cummins*, 662 F. App'x at 447 (providing notice one month before the disciplinary hearing was sufficiently timely to satisfy due process requirements). In fact, due process only compels a university to provide notice to the student "pre-expulsion." *Id.* at 446. UC unquestionably fulfilled this obligation.

Noakes's chief complaint appears to be that UC should have started an investigation and provided formal notice to him when it first learned of Roe's allegations in March 2022. But contrary to Noakes's suggestion, UC did not have a duty to provide Noakes with notice of Roe's allegations until her Formal Complaint was filed. (Title IX Policy, R. 1-3, PageID #115). In fact, UC exercised no control or influence over whether Roe would ultimately choose to file a formal complaint and could not have provided notice to Noakes in the absence of such filing.

Noakes relies on *Univ. of Cincinnati* to argue that the alleged delay in notice somehow resulted in prejudice to him or the investigatory process. This reliance is misplaced. To begin, the Court in *Univ. of Cincinnati* did not find a due process

violation based on the alleged delay, but only noted that the delay was "troubling." *See* 872 F.3d at 396. Further, the Court noted that the university did not: (1) interview the complainant until one month after receiving the formal complaint; (2) inform the plaintiff until five months after receiving the formal complaint; and (3) hold the hearing until nine months after receiving the formal complaint. *Id*. Here, by contrast, Noakes was notified three weeks after the filing of the Formal Complaint, Roe was interviewed two days after the filing of the Formal Complaint, and the hearing occurred six months after the filing of the Formal Complaint.[9]

Noakes then takes issue with the three-week period between the filing of the Formal Complaint and the Notice, complaining that this three-week delay made it "difficult, if not impossible," to defend himself and citing an affidavit from his advisor.  But Noakes offers no substance to support this claim and fails to explain how this three-week period inhibited his defense. Indeed, Noakes claims this delay hamstrung him from preserving evidence while ignoring that he had ample time to gather whatever evidence he desired beginning only two days after the alleged incident occurred. Noakes knew that Roe had made serious allegations against him within 48 hours of the sexual encounter, but admittedly took no steps to preserve evidence at that time. (Noakes Dep., R. 32 at 51:23-25, 52:1-8, PageID #1403). And

---

[9] This includes a one-month delay requested by Noakes due to his change in advisor.

even while represented by counsel in the disciplinary proceeding, Noakes took no steps to preserve evidence after receiving the PIR and FIR. (Noakes Dep., R. 32 at 72:18-25, PageID #1408).

### ii. Noakes was not entitled to information regarding Roe's supportive measures and medical records.

Noakes argues that he was denied access to information regarding any supportive measures that Roe received after she filed the Formal Complaint and, likewise, that he was denied access to Roe's medical records. (Appellant Br., Doc. 15, PageID #50). According to Noakes, UC's failure to obtain or turn over this information prohibited him from "effectively" cross-examining Roe. (*Id*.). This argument lacks merit.

Noakes is correct that, in *Univ. of Cincinnati* and *Baum*, this Court held that denying the accused a cross-examination of the complainant may violate due process in sexual assault disciplinary cases where credibility is at issue. *See* 872 F.3d at 402; 903 F.3d at 582. But Noakes's argument fails to acknowledge two very distinguishing facts: (1) Noakes was afforded the opportunity to—and did—cross-examine Roe; and (2) the information that Noakes believes he was entitled to has no bearing on Roe's credibility whatsoever.

### (1) Supportive measures.

Noakes states that he is not asking this Court to hold that a university is always required to disclose supportive measures received by victims of sexual assault to

34

satisfy due process. (Appellant Br., Doc. 15, PageID #50). Instead, he argues that such a disclosure was necessary here because the information would have allowed him to test Roe's credibility. (*Id*.). But there is no basis in the record for Noakes's suggestion that Roe's credibility could have been tested by cross-examining her on supportive measures she received.

As the District Court correctly recognized, the due process inquiry is flexible and "calls for such procedural protections as each particular situation demands." (Order, R. 48, PageID #1891). Noakes relies upon *Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881 (S.D. Ohio 2018), to argue that the situation in this case called for the disclosure of supportive measures. But the two cases could not be more different. There, the court had to decide whether defendants violated the plaintiff's right to procedural due process when the plaintiff was denied the ability to cross-examine the claimant on her potential motive to lie about the sexual assault—to obtain accommodative measures that would allow her to stay in school. *Id.* at 889. The claimant did not disclose the sexual assault until after the university had notified her that she may be dismissed for academic failure. *Id*. In determining that the evidence of accommodative measures could have been used to impeach the claimant, the court made clear that it based its decision on that "particular situation," and that it was not holding that the disclosure of accommodation information was always required to satisfy due process. *Id*. at 892.

The District Court here correctly concluded that the facts of *Ohio State Univ*. are distinguishable from this case. (Order, R. 48, PageID #1891). Noakes alleges no facts whatsoever indicating that any supportive measures received by Roe were relevant to the credibility of her complaint or testimony. Unlike the complainant in *Ohio State Univ*., Roe reported Noakes's conduct to the fraternity immediately after the incident and there is nothing in the record suggesting that she had any motive to lie about her allegations just to obtain supportive measures—for example, that she was in academic peril prior to lodging her complaint. What's more, the FIR contained information regarding supportive measures. The FIR stated that Roe *did not* request any supportive measures at the time of her interviews with Shaw in August and September 2022.[10] (Marshall Dep., R. 30-5, PageID #1078, 1085). If Roe was lying about her allegations against Noakes in an effort to obtain supportive measures, it stands to reason that she would have requested supportive measures during her interviews with Shaw. She did not. And Noakes had access to the FIR

---

[10] Noakes appears to besmirch the investigator where he states that the investigator's note regarding supportive measures contained in the FIR "may have been an effort by the investigator to hide this information; the Investigator was more equivocal about this when under oath at her deposition." (Appellant Br., Doc. 15, PageID #50). Noakes's speculation is uncalled for and inappropriate. There is no inconsistency between the investigator's deposition testimony and the information in the FIR. (Shaw Dep., R. 31 at 46:6-13, PageID #1186).

prior to the hearing and thus could have questioned Roe regarding her decision to seek or not seek supportive measures. He did not.

### (2) Medical records.

Noakes also argues that because Roe was not required to produce her medical records, the hearing panel should not have permitted her to testify about the results of her medical exam. Noakes claims that "[w]ithout discovery or disclosure of the complete medical records, Noakes had no ability to impeach this testimony." (Appellant Br., Doc. 15, PageID #51). This argument is easily debunked.

Here, Shaw informed Roe that she could provide her medical records to Shaw if Roe chose, and Roe chose not to disclose the medical records. (Shaw Dep., R. 31 at 111:25, 112:1-2, 114:9-13, PageID #1204-1205). Roe could not be forced to disclose the records, and UC was prohibited from accessing them under Title IX. Noakes appears to ask the Court to find that his due process rights were violated because Shaw could have "asked" for the records. But Shaw informed Roe that she could submit the records, and Roe declined. Further, universities are not required to seek out or even disclose every possible piece of evidence. *Doe v. Ohio State Univ*., 219 F. Supp. 3d 645, 662 (S.D. Ohio 2016) (hereafter "*Ohio State Univ. II*").

And Noakes's suggestion that he needed Roe's medical records to impeach Roe's testimony about her medical records is nonsensical. Roe testified that she "didn't release those because there was too much time had passed before I got the

37

SANE exam," and stated that the test "came back with no drugs or even alcohol in [her] system." (Compl., R. 1 at ¶ 104, PageID #42). In light of this testimony, it is unclear how Noakes believes he could have used the medical records to impeach Roe. The best possible scenario for Noakes, as acknowledged by his advisor during deposition, was for Roe's medical records to show that there were no drugs or alcohol in her system. (O'Reilly Dep., R. 33 at 102:17, 103:1-25, 104:1-25, 105:1-8, PageID #1569). But Roe testified that, in fact, her medical records showed that no drugs or alcohol were in her system. Accordingly, the medical records could not have been any more helpful to Noakes than Roe's own testimony, and it is unclear how those records could have been used to impeach Roe.[11]

### iii. The hearing panel's decision does not support an inference of bias.

Noakes argues that the merits of the hearing panel's decision supports an inference of bias. (Appellant Br., Doc. 15, PageID #52). At the outset, the Court should decline to entertain this argument because it was not presented to the District Court. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir. 2014); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("These

---

[11] Noakes alternatively argues that the hearing panel should have drawn a "negative inference" from Roe's failure to produce medical evidence. Given Roe's testimony, one is left wondering what "negative" there was for the panel to infer. More fundamentally, there is no legal authority for the proposition that due process requires such an inference.

rules generally provide that an argument not raised before the district court is waived on appeal to this Court.").

If the Court wishes to consider the merits of Noakes's argument, there are several reasons to reject it. To begin, the cases cited by Noakes, *Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020), and *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), involve claims under Title IX, and not the Due Process Clause. Noakes made clear in the proceedings below that his motion for preliminary injunction was not predicated on his Title IX claim because that claim "requires significant discovery to evaluate." (Mot. for Preliminary Injct., R. 3, PageID #171). Yet now, Noakes injects Title IX concepts into this proceeding even though the parties conducted no discovery and presented no legal argument to the District Court on that claim. Noakes suggests that the Court can apply Title IX case law in evaluating his due process claim because "[t]he same analysis applies to bias claims under the Due Process Clause since bias for *any* reason would be constitutionally impermissible." (Appellant Br., Doc. 15, PageID #52) (emphasis in original). But the District Court here evaluated bias under the legal principles applicable to Noakes's due process claim, (Order, R. 48, PageID #1888), and Noakes cites no authority for applying a Title IX concept to a due process claim.

Next, Noakes's explanation for why the hearing panel's decision is "perplexing" is unavailing. Noakes says he is perplexed by the panel's decision

because Roe testified that she thought that she had been drugged and was not drunk, but the panel concluded that she was drunk and not drugged. As discussed previously, however, the hearing panel was not required to agree with Roe's opinion of how she became incapacitated. And the panel also could credit Roe's claim that she was incapacitated while finding that the evidence was not sufficient to conclude that Roe was drugged.

On this point, Noakes claims that the panel's bias may be inferred because it "never reconciled Roe's repeated statements that she was not drunk or explained why the hearing panel found those statements to not be credible." (Appellant Br., Doc. 15, PageID #53). In reality, however, the panel *did* explain why it found Roe credible regarding her claim of incapacitation despite its conclusion that there was not sufficient evidence of drugging. Noakes relies on *Erny v. Bd. of Trustees of Indiana Univ.*, No. 1:22-cv-00524, Doc. 98 (S.D. Ind. June 3, 2024).[12] But in that case, the court noted that the panel "did not explain why it chose to largely credit [complainant's] story of the evening but not find credible her assertions that she could not have been (and, on a regular basis, was not) incapacitated by the amount of wine she drank." *Id.* at PageID #2463. Here, the panel provided a detailed explanation of its credibility determination regarding Roe in the Outcome Letter:

---

[12] Similar to the other cases cited by Noakes in making this argument, *Enry*'s "perplexing decision" analysis was made in the context of a Title IX claim.

Complainant's description of her state of intoxication was ultimately
determined to be credible. Credibility is largely a function of
consistency and corroboration. Here, although the Panel did not find
sufficient evidence that anyone was "drugged," as discussed more
below, the preponderance of the evidence does support that
Complainant was incapacitated, as defined by University of Cincinnati
policy, due to alcohol consumption. Complainant's description of her
own consumption was corroborated by other witnesses . . . and was
materially consistent over the multiple statements made by
Complainant in the course of the grievance process.

(Vincent Dep., R. 29-2, PageID #596).

Accordingly, while the hearing panel did not find evidence to support Roe's

contention that she had been drugged, it found credible—based on her consistent

accounts, the evidence in the record of alcohol consumption and corroborating

accounts of other witnesses regarding Roe's appearance at the party—Roe's claim

that she was incapacitated. And even if Roe's allegation of drugging made her a less

credible witness on the issue of her incapacitation, the hearing panel could still

reasonably conclude that her overall claim of incapacitation was credible based on

the corroborating evidence before it.

### iv.    Noakes failed to establish any errors, let alone cumulative errors, that would constitute a due process violation.

Again relying on Title IX concepts, Noakes argues that three "procedural

irregularities" occurred that cumulatively created an unfair process and an inference

of bias: (1) a former hearing panel member who was excused from the panel

commented on the hearing panel's written decision; (2) the hearing panel

41

commented on Noakes's decision not to provide a statement to the investigator; and (3) UC did not complete the adjudication in 90 business days. Like the other errors alleged by Noakes, these arguments fail to establish a due process violation.

### (1) Brett Sokolow.

Noakes suggests that the Court should infer bias because Brett Sokolow, a TNG employee who UC excused from the panel at Noakes's request prior to the hearing, continued to be involved in the matter unbeknownst to UC.[13] Noakes claims that by "edit[ing], provid[ing] substantive comments on, and ultimately 'approv[ing]' the decision prepared by the hearing panel," (Appellant Br., Doc. 15, PageID #55), Sokolow contributed to the bias of the hearing panel. The record establishes otherwise.

As the panel chair Joseph Vincent testified, Sokolow's involvement was minimal and purely administrative—he took no part in the panel's decision:

Q:      So why did he approve the panel findings in this case?

A:      Well, I think that's an inaccurate question. I think he approved the form that the panel's decision was presented in in terms of its, as I said, sufficiency, specificity. The decision of the panel is the panel's, and so Brett's job is just to ensure that the work product reflecting that decision meets the regulatory expectations or sufficiency and specificity.

---

[13] Noakes suggests that Sokolow was removed from the panel due to a "conflict of interest." UC made no such finding. Instead, upon prompting by Noakes, Sokolow was removed from the panel for Sokolow's involvement in a lawsuit that UC believed "would have served as a distraction." (Marshall Dep., R. 30 at 61:1-2, PageID #995).

(Vincent Dep., R. 29 at 26:9-16, 30:15-25, 31:1-7, 33:25, 34:1-24; PageID #502-504). Vincent also explained that:

> it wasn't [Sokolow's] job to critique the rationale or to determine if we made the right decision. It was his job as a function of the internal review to make sure it was well supported, and so regardless of the outcome that wasn't his role. … I think that's why the recusal doesn't really have the same effect on this process as you might anticipate because Brett nor anyone else was involved in the deliberations or the panel's decision. None of those decisions were altered or changed.

(*Id.* at 42:4-9, 43:18-23; PageID #506). Later in the deposition, Vincent confirmed that Sokolow played no role in the hearing panel's decision regarding responsibility or sanction:

Q:     Did Brett have any influence on the panel's decision?

A:     No.

Q:     When Brett made edits to the written decision had the panel already decided whether the respondent violated the applicable UC policy?

A:     Yes, and the appropriate sanctions.

(*Id.* at 120:23-25, 121:1-4, PageID #525-26).

## (2) Noakes's refusal to provide a statement.

Noakes argues that the hearing panel's comment regarding Noakes's decision not to provide a statement to the investigator, together with the hearing panel's decision to cut off one of his cross-examination questions, raises an inference of bias. But the hearing panel's comment regarding Noakes's failure to give a statement during the investigation was made in the context of evaluating Noakes's credibility

overall. And the hearing panel outlined numerous reasons in the Outcome Letter for why it found Noakes not credible that had nothing to do with his decision not to make a statement to the investigator. (Vincent Dep., R. 29-2, PageID #596).

With respect to the cutting off of questioning, Noakes was not entitled to unlimited questioning or to ask every question he wished to ask. *Doe v. Mich. State Univ.*, 989 F.3d 418, 431 (6th Cir. 2021) (Plaintiff was entitled to "'some form of cross-examination' that allows for a fact-finder to more accurately make a determination of credibility and to witness the claimant's demeanor on the stand."); *Cummins*, 662 F. App'x at 448 (limiting cross-examination to preapproved written questions comported with due process even if the panel "did not ask all of the questions [the accused students] submitted," and did not permit follow-up questions). Even so, Noakes's advisor freely cross-examined Roe, and the hearing panel chair applied the same standard of questioning to Roe—also limiting her advisor on cross-examination.

### (3) Title IX Policy timelines.

Noakes next argues that UC did not comply with the timelines set forth in the Title IX Policy. (Appellant Br., Doc. 15, PageID #55). But Noakes cannot rely on the purported lapse of the 90-day time period in UC's Title IX Policy to establish a due process violation. *Univ. of Cincinnati*, 173 F.Supp.3d at 603 ("[A]n allegation

that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation.").

Additionally, the record shows that no such policy violation occurred. Although UC's Title IX Policy provides that the "University *shall* make appropriate efforts to ensure" completion of the grievance process within 90 days, the policy also provides that "[t]hese timeframes are estimations of the duration of time necessary" and that "[t]emporary delay of the grievance process or the limited extension of timeframes for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action, are permissible." (Compl., R. 1-3 at § IX, PageID #114) (emphasis added). The Title IX Policy also provides that "[w]here parties, witnesses, and/or evidence needed by the investigator are delayed, temporarily unavailable, and/or otherwise withheld, good cause exists for the investigator to extend the timeframe of the investigatory process as necessary to complete a thorough and appropriate review of the matter." (*Id*. at § vii,  PageID #120-121).

UC complied with these provisions. On November 4, 2022, one month prior to the expiration of the 90-day period, Shaw sent an email to Noakes stating that "evidence needed by the investigator [was] delayed" and that "good cause exists for the investigator to extend the timeframe of the investigatory process." (PI Opp., R. 38-1 at ¶ 14; Shaw Dep., R. 31 at 99:21-25, PageID #1201). Further, in complaining

of delay, Noakes ignores his own request to delay the disciplinary hearing for over one month due to his change in advisor.

### v. Noakes fails to present any evidence that the panel members were biased.

Noakes argues that UC used biased, outside consultants as decision-makers on both the hearing and appeal panels. (Appellant Br., Doc. 15, PageID #56-59). But the District Court was correct in finding "no specific facts indicating the presence of a pre-existing bias or financial interest giving rise to a procedural due process violation." (Order, R. 48, PageID #1889).

While "a biased decisionmaker [is] constitutionally unacceptable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of *actual bias*." *McMillan v. Hunt*, No. 91-3843, 1992 WL 168827 at *2 (6th Cir. July 21, 1992) (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985)) (emphasis added). Thus, "[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Duke v. N. Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972), *cert. denied*, 412 U.S. 932 (1973). Examples of allegations that may establish a plausible claim of actual bias include allegations of personal animosity, illegal prejudice, or a personal or financial stake in the outcome. *Doe v. Bowling Green State Univ*., No. 3:22-cv-140, 2022 U.S. Dist.

46

LEXIS 179939 at *25 (N.D. Ohio Sept. 30, 2022) (internal quotations omitted). Here, Noakes cannot overcome the presumption of impartiality.[14]

Noakes alleges that UC used biased decision-makers because: (1) the hearing panel members are associated with an organization "that routinely provides expert opinions on behalf of schools that investigations were adequate in response to challenges by students found to have engaged in sexual misconduct;" and (2) the appeals panel members were affiliated with a law firm that "not only provides training, legal representation, and expert advice to educational institutions, including UC, but also represents schools in responding to Title IX claims by students." (Appellant Br., Doc. 15, PageID #57-58). These allegations wholly fail to show actual bias.

To start, a decision-maker is not "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute[.]" *Welch v. Barham*, 635 F.2d 1322, 1326 (8th Cir. 1980); *see also Doe v. Univ. of Cincinnati*, 173

---

[14] In his bias argument, Noakes again makes purported legal declarations that find no basis in the law. Noakes declares that the decision-makers in this case are not entitled to a presumption of impartiality because they are consultants, not educators. But as authority for this declaration, he only makes a vague reference to the concept that "the educational process is not by nature adversarial." (Appellant Br., Doc. 15, PageID #48). Later, Noakes argues that a showing of actual bias is not required, citing case law involving meat inspections. (*Id.*, PageID #56-57). While Noakes may not like the law that applies to his case, the District Court based its decision on the correct legal principle—university disciplinary committees are entitled to the presumption of impartiality absent a showing of actual bias.

F.Supp.3d 586, 601–02 (S.D. Ohio 2016) (citing *Gomes v. Univ. of Maine Sys.*, 365 F.Supp.2d 6, 31–32 (D. Me. 2005)) (explaining the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff ). Nor is a decision-maker disqualified for belonging to an entity that has a contractual relationship with the school. The mere existence of such a contractual relationship does not demonstrate that the decision-maker "ha[d] a pecuniary interest *in the outcome*" of the proceeding. *Withrow*, 421 U.S. at 47 (emphasis added).

At most, Noakes may be able to establish a relationship between UC and entities to which the decision-makers belong. But the fact that the decision-makers are affiliated with entities that provide certain arms-length business services to UC is not evidence of actual bias. *E.g., Cummins*, 662 Fed. Appx. at 454 (the court will not "indulge in unreasonable inferences" concerning alleged bias). And Noakes has made no showing that the panel members exhibited personal animosity, illegal prejudice, or had a personal or financial stake in the outcome. (Noakes Dep., R. 32 at 61:23-25, 62:1, PageID #1405; Vincent Dep., R. 29 at 114:14-21, PageID #524).[15]

---

[15] Noakes points to a comment made by the panel hearing chair that appeared in a New York Times article from September 2023. A fair reading of the comment (much of which consists of paraphrasing by the article's author) suggests a neutral opinion regarding cross-examination—i.e., meant to test credibility, but not particularly valuable at getting to the truth.

Finally, there is no merit to Noakes's claim that the questioning of Roe suggested that the panel members had already made up their minds. A review of the entire hearing shows that the panel allowed extensive cross-examination of Roe and applied the same standards to the questioning of Roe as they applied to the questioning of Noakes. Comments regarding the panel's desire to "get the clearest statement from [Roe] possible" and be "as clear as possible" hardly indicate bias on the part of the panel.

### D. The District Court lacks personal jurisdiction under the common-law doctrine of sovereign immunity and subject matter jurisdiction under the Eleventh Amendment.

Noakes cannot establish a likelihood of succeeding on the merits of his due process claim for the alternative reasons that: (1) he does not seek prospective relief for an ongoing violation of federal law; and (2) the Individual Defendants do not have the requisite connection to the alleged violation, both of which are required to satisfy the "*Ex parte Young*" exception. *Ex parte Young*, 209 U.S. 123 (1908).

First, Noakes's request for relief is not prospective because it merely seeks to right a purported past wrong rather than correcting an ongoing violation of federal law. *Ohio State Univ. II* is instructive in this regard. There, the court held that the request for relief was retrospective where the student sought to remove discipline from his record to improve job prospects, but did not seek reinstatement or any other prospective relief. 219 F. Supp. 3d at 654. The same is true here. Noakes does not

plead for reinstatement and does not express a desire to re-enroll at UC. (Noakes Dep., R. 33 at 9:24-25, 10:1-1-2, PageID #1392-93). Rather, Noakes seeks an injunction prohibiting something that has already happened to him—the enforcement of a policy in a manner that he considers to be unconstitutional. But even if the effect of this alleged past violation is "ongoing in the form of [Noakes's] disciplinary penalty," the alleged violative act is done.

Noakes relies on this Court's unpublished decision in *Cummins* as dispositive of the issue regarding whether he is seeking prospective relief for an ongoing violation. But the request for relief contained in Noakes's due process claim differs in material respects from the relief requested in *Cummins*. There, plaintiffs requested an injunction "prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct." 662 F. App'x at 444. The Court interpreted this request for relief as prospective in nature because "the individual defendants would merely be compelled to remove the negative notation from appellants' disciplinary records that resulted from the allegedly unconstitutional disciplinary process." *Id*. (emphasis added). The Court emphasized that such a claim for relief "would not require the court to grant *any* retrospective or compensatory remedy." *Id*. (emphasis added).

Here, by contrast, Noakes explicitly seeks retrospective relief in his due process claim. In Count II, Noakes states that he is seeking "an injunction prohibiting

the Individual Defendant [sic] from enforcing the Sexual Misconduct Policy and Code of Student Conduct against him in a manner that violates the Due Process Clauses of the United States Constitution." (Compl., Doc. 1 at ¶ 138c, PageID # 61). Unlike the relief requested in *Cummins*, Noakes's request for relief would not "merely compel" the Individual Defendants "to remove [a] negative notation." Rather, Noakes is asking for an injunction compelling the Individual Defendants to undo something that they have already done—i.e., enforcement of the Title IX Policy against Noakes in a manner he deems unconstitutional. That sort of relief is retrospective.

Second, a plaintiff who alleges an ongoing violation and seeks prospective, injunctive relief cannot sue just any individual. The individual defendant "must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains." *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013). Noakes fails to show (or even allege) any facts that would allow the Court to draw a reasonable inference that the Individual Defendants may be responsible for the conduct of which he complains. The record does not reveal any actions taken by the Individual Defendants that might lead to such an inference, and Noakes's mere allegation that the Individual Defendants are responsible for "implementing" university policy falls far short of the mark.

Accordingly, Noakes could not succeed on the merits of his due process claim because his claim fails to pass muster under *Ex Parte Young*.

## III.  Noakes Cannot Establish Irreparable Injury.

Although the District Court did not reach the issue, Noakes cannot establish that he will suffer irreparable injury in the absence of a preliminary injunction. To demonstrate irreparable injury, Noakes must show he will suffer "actual and imminent harm" rather than "harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (internal quotations omitted). This factor "*is* dispositive; a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction." *Sumner Cnty. Sch.*, 942 F.3d at 327.

Noakes dedicates one paragraph to this argument, stating in conclusory fashion that school discipline constitutes irreparable harm because this Court has held that "the risk of damage to a student's academic and professional reputations and the adverse effect on a student's ability to enroll at other institutions of higher education and to pursue a career." (Appellant Br., Doc. 15, PageID #59).[16] But Noakes does nothing to apply this rule to the facts of this case.

A review of the record reveals that Noakes has set forth no evidence that actual damage to his academic and professional reputations is imminent. It is uncontested

---

[16] Because, for the reasons stated above, Noakes cannot establish that his due process rights were violated, Noakes also is not entitled to rely on the presumption of irreparable harm that arises where a violation of constitutional right has occurred.

that Noakes's education was not interrupted by his expulsion from UC. Noakes had no desire to return to UC, enrolled in another institution and, according to his testimony, was set to graduate in the Spring of 2024. (Noakes Dep., R. 32 at 62:14-18, PageID #1406).

Noakes's ability to pursue a career has been equally unaffected. Noakes testified that he was interning with his employer, where he would likely begin working full-time upon graduating. (*Id*. at 63:7-14, PageID #1406). Any alleged adverse effect on Noakes's ability to enroll at other institutions of higher education is purely speculative. Noakes claims that he plans to apply for graduate programs. (*Id*. at 69:17-19, PageID #1407). However, Noakes has provided no evidence indicating that he has begun the application process and, at the time of his deposition, was unable to describe the type of graduate program to which he planned to apply. (*Id*. at 9:20-22, 63:23-25, 64:1-3, PageID #1392, 1406). Further, any allegation that Noakes will have to disclose that he was expelled from UC on a graduate application is purely speculative. Noakes stated during his deposition that he had "high assumptions" he might have to disclose the disciplinary proceeding on graduate program applications. (*Id*. at 10:24-25, 11:1-4, PageID #1393). That assumption is not enough to establish the actual and imminent harm required to obtain preliminary injunctive relief. *Sumner Cnty. Sch*., 942 F.3d at 327 (hypothetical threat of injury inadequate to obtain injunction).

## IV.    A Preliminary Injunction Would Cause Substantial Harm to Others and Would Not Serve the Public Interest.

Any irreparable injury that a plaintiff may suffer based on the denial of preliminary injunctive relief must be balanced against any harm that would be suffered by a defendant or others if the injunction is granted. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). Noakes contends that an injunction will not cause harm to third parties because he was permitted to remain on campus for over a year after the report. (Appellant Br., Doc. 15, PageID #60). Yet, Noakes was removed from UC immediately after the hearing panel found that he violated UC's Title IX Policy and the Appeals Panel denied his appeal.

An injunction here, moreover, would result in harm. A university should be afforded a level of deference in their disciplinary decisions and processes. *Univ. of Cincinnati*, 872 F.3d at 404 ("UC has a strong interest both in eliminating sexual assault on its campus and establishing a fair and constitutionally permissible disciplinary system") (internal quotations omitted). Issuing a preliminary injunction in this case would interfere with UC's ability to enforce its disciplinary standards, which would not be in the public interest.

## V.    Noakes Should Not Be Excused from Bond Requirements.

If the Court were to reverse the District Court's decision, it should require Noakes to give security for the payment of costs and damages that Defendants-

Appellees may incur if they are found to have been wrongfully enjoined or restrained. *See generally* Fed. R. Civ. P. 65.

## CONCLUSION

For the foregoing reasons, Defendants-Appellees respectfully submit that the District Court did not abuse its discretion in denying Noakes's motion for preliminary injunction and, accordingly, this Court should affirm.

Respectfully submitted,

*/s/ Dominick S. Gerace*
Dominick S. Gerace (0082823)
Jada M. Colon (0099048)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
dgerace@taftlaw.com
jcolon@taftlaw.com

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word-processing system used to prepare the brief, Microsoft Word, indicates that this brief contains 12,920 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Dominick S. Gerace*

## CERTIFICATE OF SERVICE

I certify that on July 3, 2024, I filed the foregoing using the Court's CM/ECF system, which will send electronic notice of such filing to all parties of record.


<u>/s/ Dominick S. Gerace</u>

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record No. | Description | Date | PageID# Range |
|---|---|---|---|
| | | | |
| 17 | Defendants' Motion to Dismiss | 7/7/2023 | 302-345 |
| 39 | Notice of Dismissal of Counts III and IV | 9/21/2023 | 1795 |